417 F.2d 587
 Lester S. COTHERMAN, individually and as General Manager of Consolidated Mortgage Company, and Willian F. Sullivan, individually and as Treasurer of Consolidated Mortgage Company, Petitioners,
v.
FEDERAL TRADE COMMISSION, Respondent.
 No. 26031.
 United States Court of Appeals Fifth Circuit.
 October 3, 1969.
 
 Thomas B. Lemann, Monroe & Lemann, New Orleans, La., Dutton, Gwirtzman, Zumas & Wise, Nicholas H. Zumas, Milton S. Gwirtzman, Washington, D. C., for petitioners.
 James McI. Henderson, General Counsel, Federal Trade Commission, Thomas F. Howder, Louis Rosenman, J. B. Truly, Asst. Gen. Counsel, Karl H. Buschmann, Attys., FTC., Washington, D. C., for respondent.
 Before WISDOM and DYER, Circuit Judges, and KRENTZMAN, District Judge.
 WISDOM, Circuit Judge:
 
 
 1
 This case arises upon a petition to review an order issued by the Federal Trade Commission directing petitioners Lester S. Cotherman and William F. Sullivan to cease and desist from deceptive advertising and unfair lending practices in violation of section 5 of the Federal Trade Commission Act, 15 U.S.C. § 45.[1] The petitioners do not challenge the Commission's substantive findings; they challenge the Commission's jurisdiction to issue the order and the breadth of the order. We hold that the Commission had the authority to issue the order, but that the order is overly broad. Accordingly, we set aside the order and remand the case to the Commission.
 
 
 2
 In October 1963 Cotherman organized Consolidated Mortgage Company in Providence, Rhode Island, to engage in the business of making loans to the general public. Cotherman was general manager and chairman of Consolidated's two-man board of directors. He hired Sullivan, an experienced loan man, to serve as president, office manager, and as the other director. Sullivan served in these capacities until 1965 when Cotherman became president and Sullivan became vice-president. As general manager, Cotherman formulated Consolidated's advertising program and approved loans submitted to him by Sullivan. Sullivan was the "front" man; he met the applicants and received their loan applications.[2]
 
 
 3
 In the course of its lending business, Consolidated regularly advertised in newspapers and on radio and television.[3] The following advertisement is typical of Consolidated's newspaper advertising:
 
 
 4
 "Homeowners
 Borrow $2000
 For Any Worthwhile Purpose
 Repay $16.88 Per Month
 1st, 2nd, & 3rd
 Mortgages

Borrow $ 1,000 Repay $ 8.44 Per Mo.
Borrow 1,500 Repay 12.66 Per Mo.
Borrow 2,000 Repay 16.88 Per Mo.
Borrow 3,000 Repay 25.32 Per Mo.
Borrow 5,000 Repay 42.20 Per Mo.
Borrow 10,000 Repay 84.39 Per Mo.

1st Mortgage Repayment Schedule.

If you're a home owner (or are in the process of buying a home)
you can consolidate all your bills and make one low monthly payment.

Call 421-0116.

Consolidated Mortgage Company, 605 Hospital Trust Bldg., Prov."
 
 
 5
 The Commission charged that Consolidated, Cotherman, and Sullivan falsely represented that an applicant could arrange a loan on the repayment schedules advertised. The hearing examiner concluded that Consolidated and Cotherman engaged in deceptive advertising. The favorable terms which were advertised were available only "to borrowers who qualify for such loans" — but few applicants "qualified", Consolidated "rarely made loans at the [advertised] repayment schedules", and most repayment schedules were substantially higher than those advertised.[4] The examiner found that Consolidated and Cotherman failed to disclose that borrowers would have to pay various closing expenses, such as fees for legal services and title searches, which might run as high as $450. The examiner dismissed the complaint against Sullivan because he found that Cotherman formulated, directed, and controlled Consolidated's advertising and lending practices.
 
 
 6
 The Commission affirmed the examiner's findings that Consolidated and Cotherman violated § 5 of the Act and approved the examiner's cease and desist order. The Commission overruled the examiner's dismissal of Sullivan, on the ground that Sullivan had managerial responsibility for the corporation's lending practices and benefitted from the corporation's loan business. After the Commission issued its final order, Cotherman dissolved Consolidated. The Commission then dismissed its order against Consolidated.
 
 I.
 
 7
 The petitioners advance three arguments in support of their position. (1) The Federal Trade Commission has no subject-matter jurisdiction, since Section 5 of the Act does not apply to credit or lending practices unrelated to sales or products. (2) The Commission improperly judged the advertisements by the standards of the Truth-In-Lending Act,[5] a statute enacted long after Consolidated had made its last loan in August 1966. (3) The Commission's complaint and cease-and-desist order should be dismissed as not in the public interest when the record shows that the petitioners have abandoned the money lending field and have declared under oath that they have no intention to return to the business.
 
 
 8
 A. The Commission takes the position that the petitioners failed to raise their first two arguments when this case was on appeal before the agency. Indeed, the Commission asserts, the petitioners in oral arguments waived all contentions except the third. "[The Supreme Court has] recognized in more than a few decisions, and Congress has recognized in more than a few statutes, that orderly procedure and good administration require that objections to the proceedings of an administrative agency be made while it has opportunity for correction in order to raise issues reviewable by the courts. United States v. L. A. Tucker Truck Lines, 1952, 344 U.S. 33, 36-37, 73 S.Ct. 67, 97 L.Ed. 54." Petitioners contend that "[t]he jurisdictional question was raised at an early stage by Consolidated and the petitioners before the Commission". In fact, the issue was raised before the examiner only, who ruled against it, and it was not appealed to the Commission. Under decisional law, petitioners' action does not constitute raising the issue before the agency and does not satisfy the rule requiring exhaustion of administrative remedies. NLRB v. Seven-Up Bottling Co., 1953, 344 U.S. 344, 350, 73 S.Ct. 287, 290-291, 97 L.Ed. 377, 383; NLRB v. International Union of Operating Engineers, Local 66, 3 Cir. 1966, 357 F.2d 841.
 
 
 9
 During the oral argument Commissioner Elman asked Mr. Zumas, counsel for the petitioners, which issues he wished to preserve and which he would waive. Commissioner Dixon pointed out that the Commission rules required counsel to determine which issues to waive and which not to waive. Mr. Zumas replied:
 
 
 10
 We will address ourselves only to the one issue, and that issue is whether or not it is in the public interest to issue a cease and desist order against a defunct corporation and against individual respondents who have abandoned and left the field and are involved in other fields of endeavor unrelated to the subject of the cease and desist order and have indicated a positive intent not to re-enter the field.
 
 [6]
 
 11
 Although counsel for the petitioners did say, early in the colloquy, "we do not waive any of the other questions involved in the record in this case", the colloquy with the Commission establishes the fact that when the question was pinpointed Mr. Zumas knew that he would waive issues not presented to the Commission. He decided to proceed only on the issue of the propriety of the cease and desist order. Moreover, the petitioners in their brief before the Commission argue only this one point. Commissioner Elman called to Mr. Zumas's attention that "the appeal brief is quite limited", that is, it did not deal with the jurisdictional question. Mr. Zumas answered: "That is correct." We conclude the Commission was not afforded an opportunity to consider subject-matter jurisdiction.
 
 
 12
 Even granting that the petitioners' counsel consciously waived the issue of subject matter jurisdiction before the Commission, we must still decide whether this waiver necessarily precludes judicial review. Courts have often said that failure to raise a question before an administrative agency precludes judicial review of that question. See United States v. L.A. Tucker Truck Lines, 1952, 344 U.S. 33, 73 S.Ct. 67, 97 L.Ed. 54; Myers v. Bethlehem Shipbuilding Corp., 1938, 303 U.S. 41, 58 S.Ct. 459, 82 L.Ed. 638; Presque Isle TV Co. v. United States, 1 Cir. 1967, 387 F.2d 502, 504-505; Davis, Administrative Law § 20.06 (1958); cf. Hormel v. Helvering, 1941, 312 U.S. 552, 61 S.Ct. 719, 85 L.Ed. 1037. This general rule, however, like most general rules, is a "verbal coat of too many colors".[7] In Hormel the Supreme Court pointed out:
 
 
 13
 Ordinarily an appellate court does not give consideration to issues not raised below * * * [but] [t]here may always be exceptional cases or particular circumstances which will prompt a reviewing or appellate court, where injustice might otherwise result, to consider questions of law which were neither pressed nor passed upon by the court or administrative agency below. 312 U.S. at 556, 61 S.Ct. at 721, 85 L.Ed. at 1041.
 
 
 14
 The problem, therefore, is whether this case is a run-of-the-mine case or an exceptional one.
 
 
 15
 In Hormel, the Court reversed on a ground not urged before the Board of Tax Appeals. Professor Jaffe has observed that the circumstances in Hormel were particularly compelling for judicial review and reversal on the new issue:
 
 
 16
 (a) Although remand was technically necessary to give the defeated party a chance to present evidence to meet the new theory, there was little likelihood that he could do so, (b) liability was clear, which is to say that application of the waiver principle would work a clear miscarriage of justice, (c) there was a good excuse for failure to raise the issue below. Jaffe, Judicial Control of Administrative Action 456 (1965).
 
 
 17
 The Supreme Court again grappled with the question of waiver in United States v. L.A. Tucker Truck Lines, supra. In that case the examiner had not been appointed in compliance with § 11 of the Administrative Procedure Act.[8] The examiner's qualifications, however, had not been challenged before the Interstate Commerce Commission. Between the end of the administrative proceeding and the appeal to the district court, the Supreme Court ruled that an examiner must qualify under § 11 of the APA. The question of the examiner's qualifications were then raised for the first time in the district court. The Supreme Court, applying the general rule, declined to review the question of the examiner's qualifications:
 
 
 18
 Simple fairness to those who are engaged in the tasks of administration, and to litigants, requires as a general rule that courts should not topple over administrative decisions unless the administrative body not only has erred but has erred against objection made at the time appropriate under its practice. 344 U.S. at 37, 73 S.Ct. at 69, 97 L.Ed. at 58.
 
 
 19
 The Court went on, however, to justify its holding on the ground that "the defect in the examiner's appointment * * * is not one which deprives the Commission of power or jurisdiction, so that even in the absence of timely objection its order should be set aside as a nullity". 344 U.S. at 38, 73 S.Ct. at 69, 97 L.Ed. at 59. This dictum implies that an issue of subject-matter jurisdiction not raised before the Commission may, nevertheless, be raised for the first time in the courts. Although Justice Frankfurter, dissenting in Tucker Truck, rejected the notion of jurisdiction as a meaningful analytical tool, lack of subject-matter jurisdiction would seem to meet his test as one of the "unwaivable limitations upon the power of these agencies". 344 U.S. at 39, 73 S.Ct. at 70.
 
 
 20
 The dictum in Tucker Truck implying that a jurisdictional attack cannot be waived by failure to raise it before the administrative agency apparently formed the basis of the Supreme Court's decision in Manual Enterprises, Inc. v. Day, 1962, 370 U.S. 478, 82 S.Ct. 1432, 8 L.Ed.2d 639. Although the authority of the Post Office to withhold "obscene" material from the mails was not argued at the administrative level, the Court heard argument and reversed on this ground without discussing the waiver point. A footnote in the concurring opinion of Chief Justice Warren and Justices Brennan and Douglas, however, spelled out what appears to be the Court's rationale for hearing the case:
 
 
 21
 The Government asserts only that at the administrative level the petitioners made no objection to the procedure. The Government does not suggest that the challenge to the Post Office's power to act at all had to be made before the administrative body. That challenge presents a jurisdictional question and is open to the petitioners even if not initially asserted in the agency proceeding. See United States v. L.A. Tucker Truck Lines, Inc., 344 U.S. 33, 38, 73 S.Ct. 67, 97 L.Ed. 54. * * * `The fragile foundation on which the Post Office action rests must be kept in mind, both in dealing with the substantive obscenity question involved and in determining the proper scope of judicial review * * *. There is lacking here the kind of specific legislative direction to the administrative agency that in certain circumstances justifies judicial deference to administrative determinations.' * * * The Court of Appeals did not discuss the issue, perhaps because it had held in Sunshine Book Co. v. Summerfield, [101 App.D.C. 358, 249 F.2d 114] supra, n. 3, that the questioned authority exists; the Government does not suggest that petitioners failed to make their argument there. And in this Court, petitioners continue their attack and the Government, without reservation, fully defends against it. 370 U.S. at 499, n. 5, 82 S.Ct. at 1443, n. 5, 8 L.Ed.2d at 653-654, n. 5.
 
 
 22
 The Supreme Court, after Tucker Truck and Manual Enterprises, seemed to be engrafting an exception onto the general rule for jurisdictional questions. But as Justice Frankfurter pointed out in Tucker Truck, "jurisdiction" itself lacks sufficiently specific content to be meaningfully applied to every set of facts.[9] A clue to which questions are "jurisdictional", for purposes of avoiding waiver at the administrative level, appears in NLRB v. Ochoa Fertilizer Corp., 1961, 368 U.S. 318, 82 S.Ct. 344, 7 L.Ed.2d 312, interpreting § 10(e) of the National Labor Relations Act.[10] The Court, citing NLRB v. Cheney California Lumber Co., 1946, 327 U.S. 385, 66 S.Ct. 553, 90 L.Ed. 739, stated that waiver would preclude judicial review, unless the agency "patently traveled outside the orbit of its authority". 368 U.S. at 322, 82 S.Ct. at 347, 7 L.Ed.2d at 315. Manual Enterprises perhaps may be explained on this basis; the Post Office clearly traveled outside its authority in withholding "obscene" materials from the mails. See Presque Isle TV Co. v. United States, 1 Cir. 1967, 387 F.2d 502, 506.
 
 
 23
 We note that the Commission has no rule requiring waiver of issues not presented to it. Many agencies have, as part of their organic statutes, specific sections precluding judicial review of any question not first raised before it.[11] The Commission had a rule at one time corresponding to these statutes, but the rule has now been abolished.[12]
 
 
 24
 The Supreme Court, however, has not based its decisions in this area of the law on statutory interpretation of codified exhaustion rules. For example, in Tucker Truck, the Court treated the case as falling within the general rule that a federal court will not hear questions not administratively exhausted. The statutes and rules are merely declarative of this limitation. The orderly administration of justice compels us to require that the administrative expertise should first be tapped before the courts are consulted.
 
 
 25
 We are unable to perceive any good reason why this Court should not apply the general rule in this case and review only those questions raised before the Commission. First, we cannot say that the Commission "patently traveled outside the orbit of its authority" in finding that the petitioners violated § 5 of the Act. On the contrary, in broad terms § 5 provides that "unfair methods of competition in commerce and unfair or deceptive acts or practices in commerce, are hereby declared unlawful". As the Supreme Court said in Federal Trade Commission v. Motion Picture Advertising Service Co., 1953, 344 U.S. 392, 394, 73 S.Ct. 361, 363, 97 L.Ed. 426, "Congress advisedly left the concept flexible to be defined with particularity by the myriad of cases from the field of business". Second, the petitioners consciously waived the jurisdictional points before the Commission.
 
 
 26
 B. The petitioners' third argument is that the cease and desist order should be dismissed against them because they have signed affidavits promising never to enter the lending business again. Courts properly leave to the Commission's non-abusive discretion the question whether the public interest requires the protection of an order in cases where unlawful practices have been discontinued. See Carter Products, Inc. v. FTC, 5 Cir. 1963, 323 F.2d 523, 531; Marlene's, Inc. v. FTC, 7 Cir. 1954, 216 F.2d 556, 559-560; Keasbey & Mattison Co. v. FTC, 6 Cir. 1947, 159 F.2d 940, 951. In deciding whether the public interest required a cease and desist order, the Commission had before it all the facts concerning the petitioners' deceptive practices and concluded:
 
 
 27
 We believe an order is justified in this case against the individual respondents in spite of the declared present intention of each not to reenter such business at any future date. Here the respondents, in a calculated fashion, misled and deceived the unknowledgeable and unsophisticated. They continued these practices until after the Commission had opened its investigation against them. Both individual respondents have in the past been associated with the lending business in other connections. Respondent, Cotherman in Erie, Pennsylvania, had previously operated the Great Lakes Discount Corporation, which he described as a business similar to that of the corporate respondent (tr. 376). Respondent Sullivan had previously been the manager of Domestic Credit Corporation in Providence, Rhode Island. The Commission cannot be assured in all such circumstances, that the individuals will not again engage in the practices. Where there is doubt, as here, an order to cease and desist is fully justified.
 
 
 28
 Even though Sullivan and Cotherman promised never to re-enter the lending business, the Commission is not bound "simply by the promise[s] of the petitioner[s]". C. Howard Hunt Pen Co. v. FTC, 3 Cir. 1952, 197 F.2d 273, 281; see Eugene Dietzgen Co. v. FTC, 7 Cir. 1944, 142 F.2d 321, 330-331; Stanley Laboratories Inc. v. FTC, 9 Cir. 1943, 138 F.2d 388, 390. A promise to go and sin no more is merely one of the circumstances that the Commission should consider in determining how the public interest in stopping the deceptive practices can best be accomplished. On the record as a whole we cannot say that the Commission abused its discretion in issuing the cease and desist order against Cotherman and Sullivan.
 
 
 29
 Implicit in our holding that the Commission did not abuse its discretion in issuing the order is the finding that the Commission's inclusion of Sullivan is supported by the record. The Commission apparently found that since Sullivan previously had been engaged in the loan business, he might sometime in the future go back into the business. See FTC v. Standard Educ. Soc., 1937, 302 U.S. 112, 119-120, 58 S.Ct. 113, 117, 82 L.Ed. 141, 146; Consumer Sales Corp. v. FTC, 2 Cir. 1952, 198 F.2d 404, 408; cf. Doyle v. FTC, 5 Cir. 1966, 356 F.2d 381. Sullivan was second in command at Consolidated and was at all times an officer and stockholder. He processed loans, met customers, had access to the corporate records of the company, and was thoroughly familiar with the loan policies of the company and the advertising techniques used to attract loan applicants. As we stated in Carter Products, holding that the Commission had not abused its discretion in joining in its order the advertising agency which had prepared the advertising for the company:
 
 
 30
 Here we are concerned with a different situation: Is one carrying out the will of another to be held responsible for the results of his actions? It appears to us that the proper criterion for deciding this question should be the extent to which the advertising agency actually participated in the deception. This is essentially a problem of fact for the Commission. 323 F.2d at 534.
 
 
 31
 We hold that the Commission's fact finding that Sullivan actively participated in the scheme and therefore should be responsible is supported by the record. See Rayex Corp. v. FTC, 2 Cir. 1963, 317 F.2d 290, 295; Pati-Port, Inc. v. FTC, 4 Cir. 1963, 313 F.2d 103, 104-105.
 
 II.
 
 32
 We conclude that the Commission's order is overly broad because it prohibits Cotherman and Sullivan from engaging in legitimate lending practices. The Commission's order reads in pertinent part:
 
 
 33
 It is Ordered that respondents, Lester S. Cotherman, individually and as General Manager of said corporation, and William F. Sullivan, individually and as an officer of said corporation, and said respondents' agents, representatives and employees, directly or through any corporate or other device, in connection with the offering of or the sale or granting of lending services, or of any similar or related services, in commerce, as "commerce" is defined in the Federal Trade Commission Act, do forthwith cease and desist from:
 
 
 34
 (a) Representing, directly or by implication, that loans are made to customers at a six-per cent rate of interest;
 
 
 35
 (b) Representing, directly or by implication, that loans made or arranged by respondents are repayable over a fifteen-year period;
 
 
 36
 (c) Representing, directly or by implication, that loans are made at any stated repayment schedule, interest rates, period of repayment or under other stated terms or conditions; provided, however, that, except for the terms and conditions covered by sub-paragraphs (a) and (b) above, it shall be a defense in any enforcement proceeding instituted hereunder for respondents to establish that loans are readily and in the regular course of business made available to customers under the stated repayment schedule, interest rates, period of repayment or other terms or conditions as stated;
 
 
 37
 (d) Misrepresenting in any manner the monthly repayment schedules, interest rates, periods of repayment or other terms or conditions under which respondents' loans are made.
 
 
 38
 Sections (a) and (b) of this part of the order prohibit Cotherman and Sullivan from representing that they will make loans at six percent repayable over a fifteen-year period. These sections are too broad because they forbid Cotherman and Sullivan from ever representing that they would lend on these terms, even if they did in fact lend on these terms. The evil the Commission intended to do away with is misrepresentation of lending terms. If Cotherman and Sullivan should represent that they would lend at six percent for fifteen years and then in fact lend at eleven percent for five years they would be covered by a cease and desist order. This order covers the case where the petitioners represent that they will lend at six percent for fifteen years and in fact lend on these terms. There is nothing illegal or deceptive about such a representation. The order should not be drawn so broadly that it will cover legitimate practices.
 
 
 39
 Section (c) of this part of the order does not cure this defect and limit coverage only to misrepresentations. Although the section provides a defense for legitimate loans, it applies only to section (c). The proviso to section (c) begins: "except for the terms and conditions covered by subparagraphs (a) and (b) above, it shall be a defense * * *" (emphasis added). The terms in subparagraphs (a) and (b) are the objectionable terms and conditions.
 
 
 40
 We affirm the Commission on its holdings as to the law and the facts, but remand the case to the Commission for it to clarify and modify its order consistently with this opinion.
 
 
 
 Notes:
 
 
 [1]
 The pertinent provisions of this Act, 15 U.S.C. § 45 are:
 Sec. 5(a) (1) Unfair methods of competition in commerce, and unfair or deceptive acts or practices in commerce, are declared unlawful.
 Sec. 5(a) (6) The Commission is empowered and directed to prevent persons, partnerships, or corporations, * * * from using unfair methods of competition in commerce and unfair or deceptive acts or practices in commerce.
 Sec. 5(b) Whenever the Commission shall have reason to believe that any such person, partnership, or corporation has been or is using any unfair method of competition or unfair or deceptive act or practice in commerce, and if it shall appear to the Commission that a proceeding by it in respect thereof would be to the interest of the public, it shall issue and serve upon such person, partnership, or corporation a complaint stating its charges in that respect * * *. If upon such hearing the Commission shall be of the opinion that the method of competition or the act or practice in question is prohibited by this [Act], it * * * shall issue * * * an order * * * to cease and desist * * *.
 
 
 [2]
 Sullivan owned 499 of the 500 shares issued by Consolidated, but these shares were pledged to Cotherman as security for a $5,000 loan from Cotherman to finance the purchase of the shares. Sullivan did not share in the profits of Consolidated; he received a salary. Cotherman also received a salary, but the amount of his salary was based on Consolidated's profits
 
 
 [3]
 Television advertisements usually showed a blackboard with a "Typical Family Problem" chart on it, depicting obligations for various items totaling $2,550 and monthly payments of $183. The announcer, referring to the chart, usually said:
 "Homeowners, it doesn't take too much imagination to see that this family is in a financial jam. * * *
 As you can see, all these bills add up to $2,550.00 and means that this family has to make a regular monthly payment of $183.00. $183.00 is a lot of money — sometimes it is too much, sometimes far more than a family can make.
 What can be done to lower this high figure?
 Come to Consolidated Mortgage Company first:
 Now watch this:-
 A $3,000.00 loan from Consolidated will pay off all the bills, leave you with $450.00 in cash — and your monthy payment could be a low $25.32."
 
 
 [4]
 Eight of the borrowers were called to testify by counsel supporting the complaint. In each instance the witness had applied for a loan after seeing or hearing one of respondent's advertisements in a newspaper or on radio or on television. In each instance the loan, as granted, required substantially larger monthly payments than the witness had anticipated having to pay on the basis of the advertised repayment schedules. Illustrative of such transactions are the following: One witness who had expected to pay $16.88 a month for a $2,000 loan, pursuant to the advertised schedule, was required to pay $53.59 a month; another, who expected to pay somewhere between $8.44 and $16.88 a month for a $1,600 loan, was required to pay $41.90 a month; another, who expected to pay $20 to $25 a month for a $2,500 loan, was required to pay $63 a month; and another, who expected to pay about $25 a month for a $3,000 loan, was required to pay $44 a month for a loan repayable over seven years, but was advised this was a mistake since the term should have been five years, and the payments were increased to $72.82 a month. The advertised repayment schedule was based on the schedule of monthly payments provided for under the FHA-approved amortization schedule for a 15-year loan at simple interest of six percent. Respondents regarded such terms as appropriate for use only in the case of relatively long-term first mortgage loans. However, the corporate respondent did not ordinarily make such loans because it considered them not to be sufficiently profitable. Its business was primarily that of secondary mortgage financing, and its loans were generally made for a five-year term (with a small proportion being made for a term of seven years), and at rates of interest substantially in excess of six percent. Where an applicant for a loan was considered eligible for a first-mortgage loan, the corporate respondent did not ordinarily make the loan, but would refer the individual to a financial institution making such loans, in return for which it received a forwarding fee
 
 
 [5]
 Title I of the Consumer Credit Protection Act, Pub.L. No. 321, 90th Cong., 2nd Sess. § 101 (May 29, 1968)
 
 
 [6]
 The complete excerpt is as follows:
 Mr. Zumas:
 Thank you, Mr. Chairman, and members of the Commission. While we do not waive any of the other questions involved in the record in this case, what we would like to do is direct the Commission's attention to one central issue, and I will spend most, if not all of my time on that question, and the question is:
 Commissioner Elman:
 Before you go on, what are the questions as to which you will not waive?
 Mr. Zumas:
 Commissioner, there were questions raised in the answer — First, let me state we did not handle the case initially. The matter was referred to our office.
 Commissioner Elman:
 You filed the appeal brief.
 Mr. Zumas:
 That is correct.
 Commissioner Elman:
 And the appeal brief is quite limited.
 Mr. Zumas:
 That is correct.
 Commissioner Elman:
 Three points: dismissal on the ground of public interest because respondent corporation is out of business and individual respondents are no longer in such business; (2) the complaint should be dismissed against respondent Sullivan and that the record and the appended affidavits confirm respondents are out of business — and I do not read anything at all in the reply brief on the merits.
 Mr. Zumas:
 The way that I can answer is: If the Commission requests us at this time to make a determination as to whether or not we waive, or require us to waive, we will direct ourselves to the major issues.
 Chairman Dixon:
 The Commission rules require you.
 Mr. Zumas:
 We will address ourselves only to the one issue, and that issue is whether or not it is in the public interest to issue a cease and desist order against a defunct corporation and against individual respondents who have abandoned and left the field and are involved in other fields of endeavor unrelated to the subject of the cease and desist order and have indicated a positive intent not to re-enter the field.
 
 
 [7]
 See United States v. L. A. Tucker Truck Lines, 1952, 344 U.S. 33, 39, 73 S.Ct. 67, 70, 97 L.Ed. 54, 59 (Frankfurter, J., dissenting).
 
 
 [8]
 5 U.S.C. §§ 556, 3105
 
 
 [9]
 Professor Jaffe feels that the concept of "jurisdiction" is too uncertain to form a basis of an exception to waiver at the administrative level. He feels that the particular conditions that he articulated in commenting onHormel would serve as sufficiently general criteria to cover all situations for avoiding the waiver rule where it should be avoided. See Jaffe, Judicial Control of Administrative Action 457 (1965).
 There is also some authority for not requiring exhaustion if it would be "futile". This exception is generally applied to failure to seek a motion for rehearing. The theory is that the agency has already adequately considered the issue and further rehearing would only be futile and time consuming. See Levers v. Anderson, 1945, 326 U.S. 219, 66 S.Ct. 72, 90 L.Ed. 26; United States v. Abilene & So. Ry., 1924, 265 U.S. 274, 44 S.Ct. 565, 68 L.Ed. 1016. This "futility" exception, however, has been applied to cases in which the administrative agencies have not yet acted. These cases have generally concerned certain agency interpretations embodied in regulations that are contrary to the party's position. The courts have assumed that the agency would follow its regulation and hold against the party, and thus any attempt to raise the point before the agency would be futile. See Waite v. Macy, 1918, 246 U.S. 606, 38 S.Ct. 395, 62 L.Ed. 892, Koepke v. Fontecchio, 9 Cir. 1949, 177 F.2d 125.
 Professor Jaffe has suggested that the "futility" exception to exhaustion should be narrowly limited to those situations in which the agency position is entirely clear, that is, where the position is formally embodied in an interpretation or regulation. Jaffe, Judicial Control of Administrative Action 449 (1965). If it could be successfully argued, Jaffe reasons, that the mere issuance of a complaint in an unfair-trade-practice case were sufficient to make any appeal to the agency futile, the whole exhaustion rule would be undermined. We agree with Professor Jaffe that the mere issuance of the complaint in this case is insufficient to make any jurisdictional attack before the Commission futile. Moreover, we cannot say from all the circumstances that the Commission's position is so clear that any presentment of a jurisdictional attack would be futile.
 
 
 [10]
 29 U.S.C. § 160(e):
 No objection that has not been urged before the Board, its member, agent, or agency, shall be considered by the court, unless the failure or neglect to urge such objection shall be excused because of extraordinary circumstances.
 
 
 [11]
 See 15 U.S.C. §§ 77i(a), 78y(a) (SEC); 16 U.S.C. § 825(b) (FPC); 29 U.S.C. § 160(e) (NLRB); 47 U.S.C. § 405 (FCC); 49 U.S.C. § 1486(e) (CAB).
 
 
 [12]
 For the old rule see 16 C.F.R. § 4.21(b) compiled in 15 U.S.C.A. § 45, at 675. This rule was amended July 1, 1967. The amended rules contain no waiver provisionSee 16 C.F.R. § 352, 32 Fed. 8454-8455 (1967).