Claude **THIRET** et al., Petitioners,

v.

**FEDERAL TRADE COMMISSION,**
Respondent.

Nos. 74–1100, 74–1112.

United States Court of Appeals,
Tenth Circuit.

March 18, 1975.

Blaine L. Boyens, Denver, Colo. (Boltz, Boyens & Glenn, Denver, Colo., on the brief), for petitioner Claude Thiret.

Richard M. Koon, Denver, Colo. (Holland & Hart, Denver, Colo., on the brief), for petitioners Certified Building Products, Inc., Certified Improvements Co., and Michael P. Thiret.

Warren S. Grimes, Washington, D. C. (Calvin J. Collier, Gen. Counsel, Gerald Harwood, Asst. Gen. Counsel, and Karl H. Buschmann, Atty., Washington, D. C.), for respondent F. T. C.

Before LEWIS, Chief Judge, and BREITENSTEIN and McWILLIAMS, Circuit Judges.

McWILLIAMS, Circuit Judge.

These consolidated cases involve two petitions for review of an order of the Federal Trade Commission that the petitioners cease and desist from certain acts and practices found by the Commission to be unfair and deceptive under Section 5 of the Federal Trade Commission Act. 15 U.S.C. § 45. The order of the Commission also provided that petitioners cease and desist from certain other acts and practices found to be in violation of the Truth-in-Lending Act, 15 U.S.C. § 1601 *et seq.*, and Regulation Z, 12 C.F.R. 226, promulgated thereunder.

The petitioners are engaged in the business of selling and installing steel siding on residential properties in Colorado, Wyoming, Nebraska, Kansas and New Mexico. One of the petitioners, Certified Building Products, Inc., was incorporated in the early 1950's, and ceased doing business in November 1970. Certified Improvements Company, another petitioner, had been dormant since its organization in 1961 and was activated in January 1970 to carry on the business previously conducted by Certified Building Products. Michael Thiret, also one of the petitioners, was president and sole owner of Certified Building Products. Claude Thiret, the remaining petitioner, was a salesman for Certified Building Products from about 1953 to 1968, at which time he became the general manager for that company. When Certified Improvements Company was activated in January 1970, Claude Thiret became its president and he made a cash contribution for which he received 40% of the company stock. Michael Thiret then became the vice-president of Certified Improvements and by virtue of his cash contribution to the company he received 60% of its stock.

Based on its investigation the Commission issued a complaint against Certified Building Products, Inc., Certified Improvements Company, Michael Thiret, Claude Thiret and one Jack Bitman, who was the secretary-treasurer of Certified Improvements Company. In Count 1 of the complaint it was alleged that the respondents had violated Section 5 of the Federal Trade Commission act by falsely and deceptively representing that their siding materials were being offered for sale at a special reduced price for a limited time only; that purchasers of the siding material would realize a 50% saving in their air-conditioning and heating bills; that the siding materials would never require repairing; that the siding materials were unconditionally guaranteed for 30 years; that homes of prospective purchasers had been specially selected as model homes, and, after installation, such homes would be used for demonstrating and advertising purposes for which the purchasers of siding material would receive allowances, discounts, or commissions; and that purchasers of the siding materials would receive enough commissions to obtain their own installation at little or no cost. Count 1 also charged that the respondents had violated Section 5 by negotiating customer obligations thus obtained to third parties, thereby cutting off certain defenses which might otherwise have been available to the customer who defaulted on his installment payments.

Count 2 of the complaint alleged that the respondents had violated the Truth-in-Lending Act and its implementing Regulation Z relating to the extension of credit to customers.

A prehearing conference was held before the Administrative Law Judge, during which Michael and Claude Thiret were deposed. As we understand it, at the time of this so-called prehearing conference it was contemplated that a consent decree would be entered as concerns the two business entities, i. e., Certified

Building Products and Certified Improvements Company, and Michael Thiret. The prehearing conference was apparently held for the primary purpose of ascertaining the degree of involvement, if any, on the part of Claude Thiret and Jack Bitman. In any event, based on the testimony of Michael and Claude Thiret given at this prehearing conference, Claude Thiret and Jack Bitman filed motions to dismiss based on the proposition that neither had any control over the activities of the salesmen who were doing the actual selling of the steel sidings.

In this posture, then, the matter was certified to the Commission by the Administrative Law Judge. The Commission, however, rejected the proposed consent decree as being inadequate, and denied the motions to dismiss made by Claude Thiret and Jack Bitman.

The entire matter then came on for full hearing before the Administrative Law Judge. After hearing the testimony of some twenty-two witnesses, the Judge dismissed both counts in the complaint as to all respondents. As to Count 1, the Judge found that complaint counsel had failed to sustain its burden of proof.

As to Count 2, though the respondents were found to have violated Regulation Z, the violation was characterized as only "technical," and not substantive in nature. Further, the Judge found that since the practices in question had been discontinued and the respondents were unlikely to resume them in the future, there was no need for a cease and desist order.

Complaint counsel then appealed the matter to the Commission, and the latter in its decision modified the Judge's order in substantial particulars. The Commission substituted its findings for those of the Judge with respect to Count 1, the Commission finding that the evidence sustained most of the allegations of unfair and deceptive trade practices as set forth in the complaint. The Commission also concluded that the violations of the Truth-in-Lending Act should be prohibited. Accordingly, cease and desist orders were issued in connection with both counts of the complaint as to all respondents, except Jack Bitman. The four petitioners in the present consolidated proceeding in this court, namely, the two business entities, Michael Thiret and Claude Thiret, seek review of the orders thus entered.

The questions to be resolved are as follows: (1) Are the findings of fact as made by the Commission supported by substantial evidence on the record as a whole; (2) do the findings in turn support the remedial orders entered by the Commission; and (3) is Claude Thiret properly held to be subject to the cease and desist orders? In our view the answer to each of the questions is in the affirmative.

■ The applicable statute provides that "the findings of the Commission as to the facts, if supported by evidence, shall be conclusive." 15 U.S.C. § 45(c). This statutory language has been held to mean that the findings of the Commission as to facts are conclusive on the courts if the findings be supported by substantial evidence. Adolph Coors Company v. F.T.C., 497 F.2d 1178 (10th Cir. 1974), and OKC Corp. v. F.T.C., 455 F.2d 1159 (10th Cir. 1972). Where, as here, the Commission in effect overrules the Judge and substitutes its findings for those of the Judge, the Commission's findings should be closely scrutinized. However, even though the Judge and the Commission may disagree as to the proper findings, our task is still to determine whether the Commission's findings are supported by substantial evidence. Universal Camera Corp. v. Labor Bd., 340 U.S. 474, 496, 71 S.Ct. 456, 95 L.Ed. 456 (1951).

■ Our study of the record as made in the instant case leads us to conclude that the findings of the Commission regarding unfair and deceptive trade practices are supported by substantial evidence. More than a score of persons who had purchased steel siding from the petitioners testified as to the selling tactics practiced upon them by

petitioners' salesmen. And to us there was a remarkable similarity in the testimony of these several witnesses. In each instance the salesmen hired by the petitioners to go out in the field and sell steel siding were using pressure tactics, of one form or another.

Many of the witnesses testified that they were led to believe that they were receiving special discount prices in exchange for use of their homes as "showcases" or "model homes," when in fact such prices were those normally charged by petitioners. In some instances, a magazine advertisement showing the manufacturer's suggested retail price for the steel siding to be higher than that charged by petitioners was used to support representations that discounts were given in connection with the model homes plan. Customers were generally informed that they must make immediate decisions, or the salesmen would go elsewhere with their offers.

Customers were told that they would receive referral commissions for finding new purchasers for petitioners' siding and services. Some who testified were informed that they could earn substantial sums and perhaps even pay for their siding through commissions. Signs were to be placed on the properties with new siding and advertising pictures were to be taken. In one case, petitioners' salesman borrowed the customer's hammer and tore off some existing siding to dramatize the "before" part of a "before and after" set of pictures for such advertising. Few, if any, of the properties ever had signs placed on them and none of the customers who testified saw any advertising pictures using his home. Several customers were led to believe that petitioners' salesmen would bring prospective buyers to their "model homes" and that they would then receive commissions if purchases ensued. The salesmen did not, to the witnesses' knowledge, bring anyone for such purpose. Some customers received small amounts of commissions, but none was able to finance to any appreciable degree the purchase of his siding.

Petitioners' salesmen also represented orally and through printed material that installation of their siding would bring significant savings in costs of heating and cooling the homes. Witnesses testified that they generally noticed little improvement. Although customers were told that the siding was unconditionally guaranteed for thirty years, they later received written guarantees from the manufacturer covering only manufacturer's defects and excluding from coverage damage due to the elements or to installation workmanship. Replacement of any defective material was to be on a prorated basis and labor costs were not included.

The fact that many of the witnesses nonetheless indicated overall satisfaction with the steel siding is not controlling. Evidence of actual deception is not necessarily essential to a finding of unfair and deceptive practices. It is the capacity to deceive which is important. Double Eagle Lubricants, Incorporated v. F.T.C., 360 F.2d 268 (10th Cir. 1965). And as was said in F.T.C. v. Colgate-Palmolive Co., 380 U.S. 374, 385, 85 S.Ct. 1035, 1042, 13 L.Ed.2d 904 (1965), "an administrative agency which deals continually with cases in the area * * * is often in a better position than are courts to determine when a practice is 'deceptive' within the meaning of the Act." In sum, the Commission's finding of unfair trade practices is in our view supported by substantial evidence.

As concerns Count 2 in the complaint, it is conceded that there had been violations of the Truth-in-Lending Act, and Regulation Z promulgated thereunder, though the petitioners contended the violations were unintentional, and quickly corrected when discovered.

█ The petitioners alternatively argue that if the Commission's findings are deemed to be supported by substantial evidence, the remedial orders were overly broad and not warranted by the findings. The Commission of course has considerable latitude in fashioning an effective cease and desist order, once an unfair trade practice is found to exist.

All that is necessary is that the Commission's remedial orders have a "reasonable relation" to the unlawful practices found to exist. And an order should ordinarily not be modified or narrowed because of hypothetical situations where lawful conduct could conceivably be prohibited by the cease and desist order. In this regard, see F.T.C. v. National Lead Co., 352 U.S. 419, at 428–429, 431, 77 S.Ct. 502, at 509, 1 L.Ed.2d 438 (1957), where the following pertinent language appears:

"The Court has held that the Commission is clothed with wide discretion in determining the type of order that is necessary to bring an end to the unfair practices found to exist. In Jacob Siegel Co. v. Federal Trade Commission, 327 U.S. 608 [66 S.Ct. 758, 90 L.Ed. 888] (1946), the Court named the Commission 'the expert body to determine what remedy is necessary to eliminate the unfair or deceptive trade practices which have been disclosed. It has wide latitude for judgment and the courts will not interfere except where the remedy selected has no reasonable relation to the unlawful practices found to exist.' *Id.*, at 612–613, [66 S.Ct. 758 at page 760]. Thereafter, in Federal Trade Commission v. Cement Institute, 333 U.S. 683, 726 [68 S.Ct. 793, 815, 92 L.Ed. 1010] (1948), the Court pointed out that the Congress, in passing the Act, 'felt that courts needed the assistance of men trained to combat monopolistic practices in the framing of judicial decrees in antitrust litigation.' In the light of this, the Court reasoned, it should not 'lightly modify' the orders of the Commission. Again, in Federal Trade Commission v. Ruberoid Co., *supra*, 343 U.S. at 473, we said that 'if the Commission is to attain the objectives Congress envisioned, it cannot be required to confine its road block to the narrow lane the transgressor has traveled; it must be allowed effectively to close all roads to the prohibited goal, so that its order may not be by-passed with impunity.' We pointed out there that Congress had placed the primary responsibility for fashioning orders upon the Commission. These cases narrow the issue to the question: Does the remedy selected have a 'reasonable relation to the unlawful practices found to exist'? * * *.

* * * * * *

"Respondents pose hypothetical situations which they say may rise up to plague them. However, 'we think it would not be good judicial administration,' as our late Brother Jackson said in International Salt Co. v. United States, 332 U.S. 392, 401 [68 S.Ct. 1217, 92 L.Ed. 20] (1947), to strike the contested paragraph of the order to meet such conjectures. The Commission has reserved jurisdiction to meet just such contingencies. As actual situations arise they can be presented to the Commission in evidentiary form rather than as fantasies. And, we might add, if there is a burden that cannot be made lighter after application to the Commission, then respondents must remember that those caught violating the Act must expect some fencing in. United States v. Crescent Amusement Co., *supra*, 323 U.S. at 187 [65 S.Ct. 254 at page 261]."

We conclude, then, that the orders here involved do have a "reasonable relationship" to both the unfair trade practices and the violations of the Truth-in-Lending Act. The fact that the petitioners took corrective action to bring their sales contracts into line with the provisions of the Truth-in-Lending Act and, in effect, promised to sin no more, is not controlling. Cotherman v. F.T.C., 417 F.2d 587 (5th Cir. 1969).

Claude Thiret contends that he should not be made subject to the cease and desist orders because he was himself only an employee of the two companies, and had no control over the salesmen who were the ones actually guilty of the unfair practices. We think that Claude Thiret's own testimony, which in our view was generally corroborated by the testimony of Michael Thiret, refutes this contention. As general manager, Claude Thiret did exercise a

degree of control over the salesmen. A command to a corporation is a command to those who are officially responsible for the conduct of its affairs. Trade Comm'n v. Education Society, 302 U.S. 112, 58 S.Ct. 113, 82 L.Ed. 141 (1937), and Wilson v. United States, 221 U.S. 361, 31 S.Ct. 538, 55 L.Ed. 771 (1911). And in our view the record supports the finding that Claude Thiret, as well as Michael Thiret, was in a command position.

Claude Thiret additionally argues that when he was dismissed from the proceedings before the Judge, he lost his right to thereafter participate in such proceedings and accordingly was precluded from putting on evidence as to his role in the conduct of the companies' affairs. This argument is highly speculative, at best. We are convinced that Thiret was not denied "his day" before either the Judge or the Commission. And, as above indicated, it was his own testimony which in our view supported the Commission's finding that he did have supervisory control over the salesmen.

Order affirmed.