**STATE of Alaska, Appellant and Cross-Appellee,**

v.

**O'NEILL INVESTIGATIONS, INC., Appellee and Cross-Appellant.**

Nos. 4109, 4165.

Supreme Court of Alaska.

March 28, 1980.

Donna Dell 'Olio, Asst. Atty. Gen., and Ann K. Stokes, Asst. Atty. Gen., of counsel, Anchorage, and Avrum M. Gross, Atty. Gen., Juneau for appellant, and cross-appellee.

James D. Rhodes and Spencer Sneed, Cole, Hartig, Rhodes, Norman & Mahoney, Anchorage, for appellee and cross-appellant.

Before RABINOWITZ, C. J., CONNOR and MATTHEWS, JJ., DIMOND, Senior Justice, and BLAIR, Superior Court Judge.

## OPINION

CONNOR, Justice.

In recent years, unscrupulous acts and practices of independent debt collection agencies[1] have come under increasing scrutiny from both the public and private sector. Consumer groups,[2] state law enforcement agencies,[3] private industry,[4] and former members of the debt collection profession itself[5] have collectively called for protection for consumers from unfair collection practices, including use of obscene or profane language, threats of violence or imprisonment, telephone calls at unreasonable hours, misrepresentation of consumer's legal rights, disclosure of consumer's financial status to third parties, and feigned use of legal process.[6]

This appeal requires us to decide whether the Alaska Unfair Trade Practices and Consumer Protection Act, AS 45.50.471–561 (the Alaska Act) stands as a sentinel against unethical and unscrupulous conduct on the part of independent debt collection businesses operating in this state.

The keystone of the Alaska Act is § 471(a) which states that "unfair or deceptive acts or practices in *the conduct of trade or commerce* are declared to be unlawful," (emphasis added) and defines "unfair or deceptive acts or practices" as "includ[ing], but . . . not limited to" 25 acts or practices, which are enumerated in § 471(b).[7] The legislature has provided that

1. For purposes of this opinion, we define an independent debt collector as a person in a business the principal purpose of which is the collection of debts owed or due or asserted to be owed or due. *See* 15 U.S.C. § 1692a(6) (Supp.1977).

2. *See e. g., Fair Debt Collection Practices Act: Hearings on S. 656, S. 918, S. 1130 and H.R. 5294 Before the Subcomm. On Consumer Affairs of the Senate Comm. on Banking, Housing and Urban Affairs*, 95th Cong., 1st Sess. 84, 98 (1977) [hereinafter *Senate Hearings*] (statement of Robert J. Hobbs, Staff Attorney, National Consumer Law Center and statement of Kathleen O'Reilly, Executive Director, Consumer Federation of America).

3. *See e. g., Senate Hearings, supra* note 2 at 567, 588 (statement of Jay Ashman, Vermont Ass't Atty. Gen.; statement of Joseph Morello, Ass't D. A. (N. Y. Cty.)). *The Debt Collection Practices Act: Hearings on H.R. 29 Before the Subcomm. on Consumer Affairs of the House Comm. on Banking, Finance and Urban Affairs*, 95th Cong., 1st Sess. 348 (1977) [hereinafter *House Hearings*] (statement of Sherry Chenoweth, Dir., Minn. Office of Consumer Services).

4. *See e. g., Senate Hearings, supra* note 2 at 752 (statement of National Home Furnishings Assn.)

5. *See e. g., House Hearings, supra* note 3 at 22, 27 (testimony of William Mann and Hugh Wilson); *Senate Hearings, supra* note 2 at 37 (testimony of Patricia Miller).

6. *See* S.Rep. No. 95–382, 95th Cong. 1st Sess. 2 (1977) *reprinted in U. S. Code Cong. & Admin. News, pp. 1695, 1696* [1977]. The rising tide of criticism culminated in 1977 in the passage of the Fair Debt Collection Practices Act, 15 U.S.C. §§ 1692–1692*o* (Supp.1977) which is aimed specifically at eliminating harassment and deception in the methods employed by independent debt collection agencies.

7. These latter proscriptions are not the exclusive basis for injunctive relief under the act; rather "[they] are in addition to and do not limit the types of unlawful acts and practices actionable at common law or under other state statutes." AS 45.50.471(c). For a discussion of the application of traditional tort remedies to debtor problems, *see* Comment, Debt Collec-

in deciding whether an act or practice is deceptive or unfair, "due consideration and great weight should be given the interpretations of sec. 5(a)(1) of the Federal Trade Commission Act (15 U.S.C. § 45(a)(1)) [the Federal Act] made by the Federal Trade Commission and the federal courts." AS 45.50.545. Exempt from the purview of the Alaska Act are any acts or transactions "regulated under laws administered by the state, by any regulatory board or commission, or officer acting under statutory authority of the state or of the United States, unless the law regulating the act or transaction does not prohibit the practices declared unlawful in § 471 of this chapter . . . ." AS 45.50.481(1). It can be noted at this juncture that the debt collection licensing statute, set out in Title 8, Chapter 24 of the Alaska Statutes, does not prohibit the practices declared to be unlawful in § 471 of the Act.

The Attorney General is charged with enforcement of the Act: [8] he may adopt interpretative regulations subject to the strictures of the Administrative Procedure Act; [9] he has broad investigatory powers in connection with ferreting out the use of deceptive trade practices; [10] and he is empowered to seek injunctive relief when he has reason to believe "that a person has used, is using, or is about to use an act or practice declared unlawful in § 471 . . . and . . . [such] proceedings would be in the public interest." AS 45.50.501(a). Where injunctive relief is sought the court has available broad equitable remedies to redress violations of the Act. AS 45.50.-501(b). Private and class actions are also authorized by the act for recovery of actual damages incurred as a result of proscribed acts and practices, including treble damages for willful violations. AS 45.50.531(a) and (b).

In a suit for injunctive relief brought by the Attorney General, a civil penalty of not more than $5,000 may be recovered for each unlawful act or practice. AS 45.50.551(b). Civil penalties of up to $25,000 may be exacted for each violation of an extant injunction. AS 45.50.551(a). The 1978 amendment to the Act, which became effective on January 1, 1980, rescinds criminal penalties for knowing and willful violations of the Act. AS 45.50.471(d) and AS 45.50.-551(c) as amended, 21 ch. 166 SLA 1978. Under these defunct criminal provisions, a sentence of up to one year in jail, a fine of $10,000, or both, could have been imposed after conviction for "engag[ing] in a course of conduct declared unlawful by § 471 . . . ." AS 45.50.551(c).

In March of 1977, the Attorney General filed a complaint pursuant to § 501 of the Act for injunctive relief and civil penalties against O'Neill Investigations, Inc., the appellee/cross-appellant. O'Neill is a corporation organized and existing under the laws of the State of Alaska. It is engaged in the business of collecting debts, under assignment, for creditors. Debt collection is a regulated industry and O'Neill has the requisite state license mandated by Chapter 24 of Title 8 of the Alaska Statutes. AS 08.-24.090.

The complaint claimed that O'Neill had employed wide-ranging false and deceptive misrepresentations in attempting to collect monies from alleged debtors or their spouses. The state charged O'Neill with misrepresenting to the debtor that failure to pay by a certain date would result in: criminal prosecution, incarceration or apprehension by law enforcement officials; civil liability; impairment of the debtor's credit rating; referral of the debtor's account to an attorney for collection; and an exaggerated increase in the debtor's obligation after judgment. The State also charged that O'Neill

---

tion Practices: The Need for Comprehensive Legislation, 15 Duquesne L.Rev. 97, 99–108 (1976) and Berger, The Bill Collector and the Law—A Special Tort, At Least for a While, 17 DePaul L.Rev. 327 (1968).

**8.** AS 45.50.491. The statute was amended in 1974 to substitute "Attorney General" for

"Commissioner of Commerce". Section 4 ch. 53 SLA 1974.

**9.** AS 44.62.010—650.

**10.** AS 45.50.495.

misrepresented to the debtor that the State of Alaska had an interest in the collection of the debt.

Further, the State alleged that O'Neill falsely and deceptively misrepresented the consequences flowing from an alleged debtor's refusal or failure to sign a confession of judgment, and misrepresented that debtors had committed crimes by the mere fact of their debt. Other unfair practices pleaded include telephoning employers of alleged debtors before entry of judgment or threatening to expose the alleged indebtedness to employers and business associates. These allegations and proof elicited at trial are discussed at length in part IV of this opinion. The complaint also averred that O'Neill's refusal to disclose its credit files upon proper demand by a consumer constitutes a violation of the Fair Credit Reporting Act, 15 U.S.C. § 1681g (Supp.1977), which governs the conduct of credit reporting agencies. Under the State's theory, violation of this federal law is a *per se* deceptive and unfair act prohibited by the Alaska Act.

O'Neill's request for a jury trial, and its motion for summary judgment were denied. The court specifically found that the activities of debt collection agencies are within the scope of § 471 of that Act, and that the language of § 471(a) affords reasonable and adequate notice of the proscribed conduct. The lower court concluded, therefore, that the Alaska Act was not unconstitutionally vague as applied to third party debt collection agencies. We denied O'Neill's petition for review of this ruling. A bench trial commenced on June 5, 1978 before Superior Court Judge Peter Kalamarides.

At the close of the State's case, the defendant moved for dismissal under Alaska Rule of Civil Procedure 41(b) and renewed its earlier motion for summary judgment. The court granted defendant's motion to dismiss on the ground that § 471(a), without interpretative regulations, was unconstitutionally vague. The trial court denied the renewed motion for summary judgment.

Findings of fact and conclusions of law were entered. The State has taken an appeal and O'Neill has cross-appealed. We will address first the issues raised by the cross-appellant.

I

█ We turn our attention initially to O'Neill's argument, which it characterizes as "[p]erhaps the single most important issue presented in this case", that the civil penalties authorized by the Alaska Act are so severe as to render them "penal" in nature. If this conclusion is correct, the imposition of civil penalties for violation of the Act would require all the constitutional safeguards against arbitrary deprivation of liberty and property afforded criminal defendants.

The common law distinguished between civil and criminal statutes by contrasting the rights of individuals with those rights belonging to society *qua* society Blackstone noted:

> "The distinction of public wrongs from private, of crimes and misdemeanors from civil injuries, seems principally to consist in this: that private wrongs, or civil injuries, are an infringement or privation of the civil rights which belong to individuals, considered merely as individuals; public wrongs, or crimes and misdemeanors, are a breach and violation of the public rights and duties, due to the whole community, considered as a community, in its social aggregate capacity."

5 W. Blackstone, Commentaries *5.

While that distinction may have served well when it was developed in the eighteenth century, it has become blurred in the rapid expansion of the domain of public law.[11] The result is offenses which are "quasi-criminal," *State v. Clayton*, 584 P.2d 1111, 1114 (Alaska 1978), and statutes which are neither purely civil nor criminal, but, rather, a hybrid.[12] The use of civil monetary penalties, woven into the fabric of

---

11. *See* Jaffe, Judicial Control of Administrative Action 3–10 (1965).

12. *See* Legislation, Statutory Penalties—A Legal Hybrid, 51 Harv.L.Rev. 1092, 1093 (1938).

many regulatory statutes as a sanction for non-compliance, has become commonplace.[13]

O'Neill's contention is not novel. In *Atlas Roofing Co. v. Occupational Safety and Health Review Commission*, 518 F.2d 990 (5th Cir. 1975), *aff'd on other grounds*, 430 U.S. 442, 97 S.Ct. 1261, 51 L.Ed.2d 464 (1977), the court addressed a challenge to the constitutionality of the Occupational Safety and Health Act of 1970,[14] on grounds identical to those advanced here by O'Neill. Atlas was cited for violating that Act and was assessed a $600 civil fine. The Act provided for both civil and criminal monetary penalties; Atlas claimed the distinction between the two was blurred because either could be applied to essentially the same conduct. The court concluded that the civil sanctions did not constitute criminal penalties:

> "[T]aken as a whole, we think that Atlas has failed to demonstrate that Congress meant the statute to reprimand rather than regulate. The focus of the statute—the control of job site safety practices and health conditions—has a demonstrable and legitimate government concern. The fact that the civil enforcement sanctions are inherently disabilities does not alter the nature of the Congressional purpose. And finally the Congressional purpose carefully to establish both civil and criminal sanctions and distinguishable procedures for imposing and review-

ing them eliminate any question of Congressional intent." (footnote omitted). 518 F.2d at 1011.

An identical claim was carefully considered and rejected in *Frank Irey Jr., Inc. v. Occupational Safety and Health Review Commission*, 519 F.2d 1200 (3rd Cir. 1975), *aff'd on other grounds*, 430 U.S. 442, 97 S.Ct. 1261, 51 L.Ed.2d 464 (1977).[15] Irey was cited for violations of the Occupational Safety and Health Act and, after a hearing conducted by an OSHA examiner, was found guilty of willful violation of the Act and assessed a civil penalty of $5,000, one-half of the maximum amount allowed. Irey challenged the constitutionality of the Act on the grounds, *inter alia*, that as to corporations, the criminal penalties were precisely the same as the civil, and that, therefore, the latter could not be imposed without benefit of the rights of criminal defendants under the Fourth, Fifth, Sixth, and Seventh Amendments to the United States Constitution. The Court said:

> "There is force and logic to these arguments, and we do not dismiss them lightly. Fatal to the petitioner's view, however, is a series of Supreme Court decisions which have validated the position that Congress has a wide range of alternatives available to it for enforcing its legislative policy . . . . [T]he same conduct may subject a person to both civil

---

**13.** For a history of the development of civil monetary sanctions, *see* Goldschmid, An Evaluation of the Present and Potential Use of Civil Money Penalties as a Sanction by Federal Administrative Agencies, in 2 Recommendations and Reports of the Administrative Conference of the United States 896 (1973). *See also* Abrahams & Snowden, Separation of Powers and Administrative Crimes: A Study of Irreconcilables, 1976 S.Ill.U.L.J. 1 (1976); Charney, The Need for Constitutional Protections for Defendants in Civil Penalty Cases, 59 Cornell L.Rev. 478 (1974); Gellhorn, Administrative Prescription and Imposition of Penalties, 1970 Wash.U. L.Q. 265 (1970); Comment, OSHA Penalties: Some Constitutional Considerations, 10 Idaho L.Rev. 223 (1974); Comment, The Imposition of Administrative Penalties and the Right to Trial by Jury—An Unheralded Expansion of Criminal Law?, 65 J. Crim. L. & C. 345 (1974).

Not all administrative statutes characterize their sanctions as civil, but the movement to

substitute civil for criminal penalties was endorsed by a unanimous recommendation of the Administrative Conference of the United States in 1972. *See*, 2 Recommendations and Reports of the Administrative Conference of the United States 67–70 (1973).

**14.** 29 U.S.C. § 651, et seq. (1976). That act employs a streamlined enforcement procedure under which the Secretary of Labor assesses a civil penalty after an OSHA inspector has cited an employer for failure to provide a safe working environment under the terms of the act. The enforcement procedure is laid out in detail in *Atlas*, 518 F.2d at 995–1000.

**15.** *Atlas* and *Irey* were consolidated on appeal but the Supreme Court granted certiorari only as to the question whether OSHA procedures denied defendant's their Seventh Amendment right to a jury trial. 424 U.S. 964, 96 S.Ct. 1458, 47 L.Ed.2d 731 (1976).

and criminal sanctions, if the civil aspects are considered remedial.

In the case *sub judice,* candor compels us to concede that the punitive aspects of the OSHA penalties, particularly for a "willful" violation, are far more apparent than any "remedial" features. However, a deliberate and conscious refusal to abate a hazardous condition may bring about a situation where a heavy civil penalty might be needed to effect compliance with safety standards. In any event, we have now come too far down the road to hold that a civil penalty may not be assessed to enforce observance of legislative policy. Although the label attached by Congress does not preclude judicial review of a statute which transgresses a constitutional right, no such infraction has occurred here."

519 F.2d at 1204 (footnotes and citations omitted).

In reaching this conclusion, the court relied on a decision of the second circuit, *United States v. J. B. Williams Co.,* 498 F.2d 414 (2d Cir. 1974) (Friendly, J.). There the Federal Trade Commission had issued a cease and desist order against Williams and another advertising agency requiring them to refrain from making certain representations about the effectiveness of the product Geritol as a general curative for tiredness and loss of strength. After a determination that the agencies had failed to comply with the terms of the order, the F.T.C. commenced enforcement proceedings, demanding a judgment of $500,000 against each defendant.[16] The government's motion for summary judgment was granted and the defendants appealed on the theory that an action to recover penalties under § 5(*l*) of the Federal Trade Commission Act was criminal in nature and thus inappropriate

for summary judgment disposition. The court rejected this claim. Since Congress has the power to exact either civil or criminal penalties for violations of statutes,

"[W]hen Congress has characterized the remedy as civil and the only consequence of a judgment for the Government is a money penalty, the Courts have taken Congress at its word. . . . Appellants urge us to overlook Congress' express characterization of § 5(1) as a "civil" action and to hold the sanction imposed in this case criminal because of its allegedly punitive purpose. While Congress could not permissibly undermine constitutional protections simply by appending the "civil" label to traditionally criminal provisions, the statute here at issue is plainly not of that class. In the face of a long line of contrary authority, appellants have not directed our attention to any civil penalty provision that has been held sufficiently "criminal" in nature to invoke the protections of the Sixth Amendment." 498 F.2d at 421. (citations and footnotes omitted) [17]

We find the reasoning of the *Williams* court dispositive of O'Neill's claim. The Attorney General sought injunctive relief pursuant to § 501 of the Alaska Act to restrain the use of alleged unlawful acts and practices by O'Neill. As a corollary to injunctive relief under § 501, the Alaska Act provides for a "civil penalty" of not more than $5,000 per violation under § 551(b) upon a finding by the court that an unlawful act or practice has been or is being used. The legislature's characterization of the penalty as civil is, under the circumstances, entitled to great weight. We find that the Alaska Act, as applied to O'Neill, is not a penal statute.[18]

---

16. 15 U.S.C. § 45(*l*) provided for a civil penalty of not more than $5,000 for each violation of an F.T.C. cease and desist order and that such penalty or forfeiture "may be recovered in a civil action brought by the United States." The penalty provision has since been increased to $10,000 for each violation of 15 U.S.C. § 45(*l*) (1976).

17. Followed in *Mohawk Excavating, Inc. v. Occupational Safety & Health Review Comm'n,* 549 F.2d 859, 863 (2d Cir. 1977); *Ward, v. Coleman,* 423 F.Supp. 1352, 1355 (W.D.Okl. 1976); *United States v. Eureka Pipeline Co.,* 401 F.Supp. 934, 937 (N.D.W.Va.1975); *United States v. General Motors Corp.,* 403 F.Supp. 1151, 1161 (D.Conn.1975).

18. It should be noted that three members of the panel deciding this case concur in the separate

■ Therefore, we reject O'Neill's contention that the provisions of the Act should be strictly construed,[19] for it is basic that remedial civil statutes are to be accorded a liberal construction.[20]

■ We do not address the question of whether O'Neill has a right to jury trial, for we find the briefing on this point inadequate. When, in the argument portion of a brief, a major point has been given no more than cursory statement, we will not consider it further. Failure to argue a point constitutes an abandonment of it.[21]

II

■ Next, O'Neill challenges as erroneous the trial court's ruling that the Alaska Act embraces independent debt collection practices.[22] This argument is in large part predicated upon O'Neill's claim, which we have rejected in Part I of this opinion, that the Alaska Act must be strictly construed.[23] As a second ground for reversal of the lower court ruling, O'Neill contends that the exemption contained in § 481(1) precludes application of the act to acts and practices of debt collection agencies. Section 481(1) exempts:

"(1) an act or transaction regulated under laws administered by the state, by any regulatory board or commission, or officer acting under statutory authority of the state or of the United States, unless the law regulating the act or transaction does not prohibit the practices declared unlawful in § 471 of this chapter."

Debt collection agencies are regulated by Title 8, Chapter 24. Mere regulation under a separate and distinct statutory scheme, however, ˙ satisfies only one prong of § 481(1); unfair acts and practices are exempt from the purview of the Act only where the business is both regulated elsewhere *and* the unfair acts and practices are therein prohibited. With one exception,[24] Chapter 24 of Title 8 does not prohibit the acts and practices alleged in the State's complaint. Indeed Chapter 24 does not regulate the activities of debt collection agencies vis-a-vis debtors; its primary concern is the relationship between debt collection agencies and the State. We find, therefore, that the exemption clause does not withdraw the activities of independent debt collection agencies from the scope of the Act.

opinion of Justice Dimond, and reach the conclusion that this is not a penal statute, but by a different avenue than do the author of this opinion and Judge Blair. No penalties under the criminal provisions of the Act have been sought and, O'Neill recognizes, as it must, that this court's inquiry into the nature of the civil provisions of the Act must be limited to the facts of this case.

19. Criminal statutes should be strictly construed. 3 Sands, Sutherland on Statutory Construction § 59.03 at 6 (4th ed. 1974).

20. *Id.* § 60.01 at 29. O'Neill argues that because the Alaska Act contains some penal provisions the entire act must be strictly construed. We disagree. Several courts have refused to strictly construe remedial legislation merely because that legislation punishes willful violations by imposing criminal penalties. *See, e: g., Laman v. McCord*, 245 Ark. 401, 432 S.W.2d 753, 755 (1968); *Board of Public Instruction v. Doran*, 224 So.2d 693, 699 (Fla. 1969); *State ex. rel. Turner v. Koskot Interplanetary, Inc.*, 191 N.W.2d 624, 629 (Iowa 1971) (construing Iowa Consumer Protection Act); *Commonwealth v. Monumental Properties, Inc.*, 459 Pa. 450, 329 A.2d 812, 817 (1974)

(construing Pennsylvania Unfair Trade Practices and Consumer Protection Act); *State v. Ralph Williams North West Chrysler Plymouth, Inc.*, 82 Wash.2d 265, 510 P.2d 233, 242 (1973) (construing Washington Consumer Protection Act).

21. *Lewis v. State*, 469 P.2d 689, 691–92 n. 2 (Alaska 1970). *See also, L. E. Spitzer Co. v. Barron*, 581 P.2d 213 (Alaska 1978); *Kristich v. State*, 550 P.2d 796, 804 (Alaska 1976); *Wernberg v. Matanuska Electric Association*, 494 P.2d 790, 794 (Alaska 1972).

22. O'Neill challenged the applicability of the act to its activities in its pre-trial motion for summary judgment, which it renewed at the close of the state's case-in-chief. Both motions were denied.

23. O'Neill's contention that the doctrine of *ejusdem generis* is applicable is without merit.

24. AS 08.24.320 prohibits the use by collection agencies of documents which imitate judicial process. Therefore, the use of such imitative documents would be exempted from the reach of AS 45.50.471–561.

Finally, O'Neill argues that the lower court erred in its application of the legislative directive of § 545 of the Alaska Act which provides that "[i]n interpreting § 471 of this chapter due consideration and great weight should be given the interpretations of sec. 5(a)(1) of the Federal Trade Commission Act (15 U.S.C. § 45(a)(1))[25] made by the Federal Trade Commission and the federal courts."[26] According to O'Neill, the error was two-fold: first, the court gave excessive weight and undue consideration to administrative and judicial interpretations of the Federal Trade Commission Act which are "neither analogous nor persuasive" because the Federal Act does not reach third party debt collection. Second, the court failed to "accurately assess the implications" of the Federal Fair Debt Collection Practices Act.[27] We find both of these arguments to be unpersuasive.

██ First, it is beyond dispute that the Federal Trade Commission has asserted its jurisdiction over unfair or deceptive acts and practices of debt collection agencies, by administrative rule-making[28] and administrative adjudication.[29] Contrary to O'Neill's assertion, adjudications which are resolved by consent decree constitute an administrative interpretation of the Federal Trade Commission Act which have clear precedential value.[30]

**25.** Section 5(a)(1) of the F.T.C. Act reads:

Unfair methods of competition in commerce, and unfair or deceptive acts or practices in commerce, are declared unlawful.

**26.** *The superior court held:*

"[T]he language of AS 45.50.471 [is] sufficiently broad to encompass collection activities. The language of AS 45.50.545 instructs the Court that in interpreting section 471 of this chapter due consideration and great weight shall be given to the interpretations of the Federal Trade Commission Act (15 U.S.C. 45(a)(1)). . . . I find that the general words of section 471(a) are not restricted in meaning of objects *ejusdem generis* because of the clear intent expressed by AS 45.50.545 that great weight should be given to the interpretations of this language under the Federal Trade Commission Act."

**27.** 15 U.S.C. § 1692 et seq. (Supp.1977).

**28.** *See* 16 C.F.R. Part 237 (1979), entitled Guidelines Against Debt Collection Deception, adopted by the Federal Trade Commission in 1967. These regulations provide in pertinent part that no debt collection agency shall use "any deceptive representation or deceptive means to collect or attempt to collect debts or to obtain information concerning debtors." 16 C.F.R. § 237.1 (1979). These regulations rebut O'Neill's attempt to distinguish the federal act as lacking "enumeration of particular instances of unfair or deceptive practices."

**29.** *See e. g.,* State Credit Ass'n, 86 F.T.C. 502 (1975) (unfair and deceptive to question third parties in the debtors household about the debt, to use collection forms which misrepresented that legal action was about to be initiated on unpaid debts or that unpaid debts would be referred to an attorney or that failure to make full payment would result in impairment of credit status and privileges); American Credit Bureau, Inc., 84 F.T.C. 1582 (1974) (deceptive or unfair to discuss debtor's obligation with debtor's employers, relatives and friends; to misrepresent to debtors that failure to pay amounts requested will result in criminal prosecution by law enforcement authorities, garnishment of wages or other immediate legal action); and Sunshine Art Studios, Inc., 81 F.T.C. 836 (1972) (deceptive practice to misrepresent that unpaid debts would be referred to attorney for immediate legal action); Wilson Chemical Co., 64 F.T.C. 168 (1964) (same).

*See also,* Hearst Corp., 82 F.T.C. 218 (1973); Neighborhood Periodical Club, Inc., 81 F.T.C. 93 (1972); Key Learning Systems, Inc., 81 F.T.C. 296 (1972); Empire Accounts Serv., Inc., 80 F.T.C. 257 (1972); Associated Claims, Inc., 80 F.T.C. 794 (1972); Interstate Credit Corp., 78 F.T.C. 963 (1971); Pilgrim Financial Serv., 77 F.T.C. 1138 (1970); Illinois Collection Serv., 77 F.T.C. 1336 (1970); Mutual Credit Bureau, Inc., 76 F.T.C. 448 (1969); Edward L. Cox, 71 F.T.C. 485 (1967); International Creditors Ass'n, 70 F.T.C. 19 (1966); State Credit Control Bd., 70 F.T.C. 1318 (1966); Joseph L. Portwood, 73 F.T.C. 68 (1966); History Book Club, Inc., 66 F.T.C. 951 (1964); Greystone Corp., 66 F.T.C. 1108 (1964); Timed Energy, Inc., 65 F.T.C. 914 (1964); Walter J. Clack, Inc., 65 F.T.C. 1268 (1964); Doubleday & Co., Inc., 65 F.T.C. 1280 (1964); Family Publication Serv., Inc., 63 F.T.C. 971 (1963); Credit & Investigation Bureau of Md., 67 F.T.C. 277 (1965); Parents' Magazine Enterprise, Inc., 68 F.T.C. 980 (1965); House of Plate, Inc., 47 F.T.C. 1411 (1951).

**30.** *See F. T. C. v. Mandel Bros.,* 359 U.S. 385, 79 S.Ct. 818, 3 L.Ed.2d 893 (1959). The consent order procedure is summarized in E. Rockefeller, Desk Book of FTC Practice and Procedure 85–88 (2d ed. 1976). For purposes of compliance, the Commission treats consent orders identically to those which have been litigated. *Id.* at 98.

Second, we do not agree that the recent enactment of the federal Fair Debt Collection Practices Act, 15 U.S.C. § 1692 (Supp.1977), which specifically prohibits all false, deceptive, misleading, unfair or harassing collection practices, is evidence that such practices were not prohibited by prior federal law.[31] This claim ignores the new rights and remedies created by the Fair Debt Collection Practices Act: consumers now have a private right of action against creditors [32] unavailable under the Federal Trade Commission Act; the consumer now has the right to cut off collection agency contacts; [33] and collection agencies now have an affirmative duty to furnish alleged debtors with detailed information regarding the amount owed.[34] The new act *expands* already existing Federal Trade Commission jurisdiction over unfair or deceptive acts and practices of collection agencies; it is not written on a clean slate. The Federal Trade Commission's prior exercise of jurisdiction in this area is entitled to great weight, *U. S. v. Shreveport Grain & Elevator Co.*, 287 U.S. 77, 84, 53 S.Ct. 42, 44, 77 L.Ed. 175, 179 (1932), and leads to the conclusion that the new Act merely supplements the old. We are of the opinion that the subsequent enactment of legislation does not establish affirmative proof of no prior authority.[35]

In summation, we conclude that the above grounds urged for reversal of the denial of the motion for summary judgment are without merit.

### III

In granting O'Neill's motion for Rule 41(b) dismissal, the superior court held that AS 45.50.471(a) is unconstitutionally vague as applied to the particular acts proven at trial. In its Conclusions of Law, the court stated:

"Alaska Statutes 45.50.471(a) standing alone is vague and uncertain in application to the Defendant's activities, as set forth above, and as evidenced during the trial, in that said provision does not afford Defendant equal protection of the law and due process of law as required by the Fourteenth Amendment to the U.S. Constitution and Article I, Section 7 of the Constitution of the State of Alaska. The failure by the State to adopt regulations spelling out the intent of the unfair and deceptive practices it seeks to condemn precludes the Defendants and others similarly situated from being apprised as to what conduct is prohibited or otherwise prescribed. It is not the Court's prerogative to intervene in the legislative area or the executive branch by guessing as to what acts or practices the legislature had in mind in adopting AS 45.50.471 *et seq.*" [36]

---

**31.** The legislative history notes that "the serious and widespread abuses in [the debt collection] area and the inadequacy of existing State and Federal laws make this legislation necessary and appropriate." Senate Rep.No. 95–382 at 3, 95th Cong.2d Sess., *reprinted in* [1977] Code Cong. & Admin.News, pp. 1695, 1697. The new act became effective on March 20, 1978 after the filing of the complaint in this case.

**32.** 15 U.S.C. § 1692k (Supp.1977).

**33.** 15 U.S.C. § 1692c (Supp.1977).

**34.** 15 U.S.C. § 1692g (Supp.1977).

**35.** *See F. T. C. v. Dean Foods Co.*, 384 U.S. 597, 610, 86 S.Ct. 1738, 1746, 16 L.Ed.2d 802, 811 (1966) (court will not construe an agency's request for authorizing legislation as affirmative proof of no authority; "[p]ublic policy requires that agencies feel free to ask legislation which

will terminate or avoid adverse contentions and litigations"); *National Petroleum Refiners Ass'n. v. F. T. C.*, 157 U.S.App.D.C. 83, 107, 482 F.2d 672, 696 (1973), *cert. denied*, 415 U.S. 951, 94 S.Ct. 1475, 39 L.Ed.2d 567 (1974) (subsequent grant of congressional authority does not prove agency's prior lack of authority; "it is equally possible that Congress granted the power out of uncertainty, understandable caution, and a desire to avoid litigation").

**36.** This conclusion was contrary to that which was reached by the superior court in its decision denying O'Neill's motion for summary judgment.

"When section 471(a) is read as a whole with the illustrative examples defining unfair practices provided in 471(b), the statute gives adequate notice of proscribed conduct . . . Since cursory legal research would reveal literally dozens of federal court and agency interpretations of statutory language nearly

O'Neill urges affirmance of this ruling, whereas the state argues that the court erred in finding the statute vague as applied and in granting the motion to dismiss.

It is well established that "a statute which either forbids or requires the doing of an act in terms so vague that men of common intelligence must necessarily guess at its meaning and differ as to its application violates the first essential of due process of law." [37] There are three principal considerations in determining whether a statute is unconstitutionally vague.[38] First, the statute may not operate to inhibit the exercise of first amendment rights.[39] Second, the statute must provide adequate notice of what conduct is forbidden.[40] Third, the statute may not be drawn so imprecisely that it encourages arbitrary and discriminatory enforcement of the law.[41] We must address each of these considerations in deciding whether section 471 of the

Alaska Act is impermissibly vague as applied to O'Neill.

The challenged language reads: "Unfair methods of competition and unfair or deceptive acts and practices are declared unlawful." We find that this statute does not, as applied to the facts, chill constitutionally protected speech. The speech in question involves communications regarding alleged debts and thus, as O'Neill concedes, falls within the rubric of commercial speech. Commercial speech enjoys a lesser first amendment protection than noncommercial speech. Thus, some forms of commercial speech regulation are permissible because commercial speech is hardier—less subject to chill.[42] The United States Supreme Court has upheld state restrictions against false, deceptive and misleading commercial statements. In *Friedman v. Rogers*, 440 U.S. 1, 99 S.Ct. 887, 59 L.Ed.2d 100 (1979), *quoting Virginia State Bd. of Pharmacy v. Virginia Citizens Consumer*

---

identical to Alaska's, defendant's argument that he was not reasonably or adequately put on notice of prohibited conduct must fail. I do not find that section 471(a) as used in this suit and as the basis for the civil remedy prayed for by plaintiff [is] . . . unconstitutionally vague as presented within the issues of this motion for summary judgment."

The state urges us to view "as an oversight" the court's language with respect to equal protection of the law and to reverse the conclusion of law because it was "included by mistake." Neither side has properly briefed this argument. We therefore will not consider it as an issue properly preserved on appeal. See cases cited in note 13, *supra*.

**37.** *Connally v. General Construction Co.*, 269 U.S. 385, 391, 46 S.Ct. 126, 127, 70 L.Ed. 322, 328 (1926).

**38.** *Larson v. State*, 564 P.2d 365, 371–72 (Alaska 1977); *Anderson v. State*, 562 P.2d 351, 355–56 (Alaska 1977); *Stock v. State*, 526 P.2d 3, 7–8 (Alaska 1974); *State v. Marathon Oil Co.*, 528 P.2d 293, 297–98 (Alaska 1974).

**39.** *Grayned v. City of Rockford*, 408 U.S. 104, 109, 92 S.Ct. 2294, 2299, 33 L.Ed.2d 222, 228 (1972).

**40.** *Papachristou v. City of Jacksonville*, 405 U.S. 156, 162, 92 S.Ct. 839, 843, 31 L.Ed.2d 110, 115 (1972); *Marks v. City of Anchorage*, 500 P.2d 644, 646 (Alaska 1972).

**41.** *Papachristou v. City of Jacksonville*, 405 U.S. 156, 170, 92 S.Ct. 839, 847, 31 L.Ed.2d 110, 120 (1972).

**42.** The basis for affording commercial speech a lesser First Amendment protection was explained succinctly by Justice Stewart:

The principles recognized in the libel decisions suggest that government may take broader action to protect the public from injury produced by false or deceptive price or product advertising than from harm caused by defamation. In contrast to the press, which must often attempt to assemble the true facts from sketchy and sometimes conflicting sources under the pressure of publication deadlines, the commercial advertiser generally . . . is in a position to verify the accuracy of his factual representations before he disseminates them. The advertiser's access to the truth about his product and its price substantially eliminates any danger that governmental regulation of false or misleading price or product advertising will chill accurate and nondeceptive commercial expression. There is, therefore, little need to sanction "some falsehood in order to protect speech that matters."

*Virginia State Bd. of Pharmacy v. Virginia Citizens Consumer Council*, 425 U.S. 748, 777–78, 96 S.Ct. 1817, 1833, 48 L.Ed.2d 346, 368 (concurring opinion).

*Council,* 425 U.S. 748, 771–72, 96 S.Ct. 1817, 1830–1831, 48 L.Ed.2d 346, 364–65 (1976), the court stated:

> "Untruthful speech, commercial or otherwise, has never been protected for its own sake. *Gertz v. Robert Welch, Inc.,* 418 U.S. 323, 340, 94 S.Ct. 2997, 3007, 41 L.Ed.2d 789, 805–806 (1974); *Konigsberg v. State Bar,* 366 U.S. 36, 49, and n.10, 81 S.Ct. 997, 1005–1006, 6 L.Ed.2d 105, 116 (1961). Obviously, much commercial speech is not provably false, or even wholly false, but only deceptive or misleading. We foresee no obstacle to a State's dealing effectively with this problem. The First Amendment, as we construe it today, does not prohibit the State from insuring that the stream of commercial information flow cleanly as well as freely." [43]

█ Diminished protection for commercial speech is a logical extension of the "marketplace theory" of the First Amendment. T. Emerson, The System of Freedom of Expression 6–7 (1971); T. Emerson, Toward a General Theory of the First Amendment 3–15 (1966). The crux of the theory is that truth is discovered through its competition with falsehood for acceptance. The Supreme Court has consistently relied upon the marketplace of ideas to determine what speech is protected. *See e. g., Red Lion Broadcasting Co. v. F. C. C.,* 395 U.S. 367, 390, 89 S.Ct. 1794, 1806, 23 L.Ed.2d 371, 389 (1969); *New York Times Co. v. Sullivan,* 376 U.S. 254, 269, 84 S.Ct. 710, 720, 11 L.Ed.2d 686, 700 (1964); *Roth v. U. S.,* 354 U.S. 476, 484, 77 S.Ct. 1304, 1308, 1 L.Ed.2d 1498, 1506 (1957). If the pursuit of truth is the touchstone for First Amendment protection of speech, that protection will not be

extended to the content of deceptive commercial speech. *Bates v. State Bar of Arizona,* 433 U.S. 350, 383–84, 97 S.Ct. 2691, 2708–09, 53 L.Ed.2d 810, 835–36 (1977); *Linmark Associates, Inc. v. Township of Willingboro,* 431 U.S. 85, 96, 97 S.Ct. 1614, 1620, 52 L.Ed.2d 155, 164 (1977); *Young v. American Mini Theaters, Inc.,* 427 U.S. 50, 68, 96 S.Ct. 2440, 2451, 49 L.Ed.2d 310, 325 (1976); *Bigelow v. Virginia,* 421 U.S. 809, 828, 95 S.Ct. 2222, 2235, 44 L.Ed.2d 600, 615 (1975). The Alaska Act does not attempt to suppress truthful commercial speech, for its prohibition extends only to unfair or deceptive speech. We think that the regulations imposed by the Act are permissible and even necessary to ensure that the stream of information regarding alleged debts will flow "cleanly."

█ Second, we find that the words of Section 471(a) have a "well-defined" meaning in the area of trade regulation and are therefore not vague. Since the Alaska Act directs that this section be interpreted by giving "great weight" and "due consideration" to the F.T.C. and federal court interpretations of the analogous federal statute,[44] the words have a fixed meaning which has survived challenges for vagueness.[45] It is axiomatic that words will be infused with the meaning of prior judicial construction.[46] The relevant prior judicial construction here is that which has emerged from agency and judicial interpretation of the identical words of the federal statute.

The Federal Trade Commission Act as initially enacted in 1914 prohibited "unfair methods of competition." Congress considered and rejected the suggestion that it minimize the ambiguity of this phrase. The House Conference Committee explained:

---

**43.** Even if false or misleading commercial speech were given full first amendment protection—as false political speech has, *Gertz v. Robert Welch, Inc.,* 418 U.S. 323, 339–41, 94 S.Ct. 2997, 3006–07, 41 L.Ed.2d 789, 805–06 (1974)—the weight it would be given when balanced against the state's interest in protecting consumers against deceptive or unfair acts or practices in trade or commerce would be *de minimus. See,* Note, Unsafe for Little Ears? The Regulation of Broadcast Advertising to Children, 25 U.C.L.A.L.Rev. 1131, 1142 (1978).

**44.** AS 45.50.545. *See* discussion accompanying note 25, *supra.*

**45.** *Sears, Roebuck & Co. v. F. T. C.,* 258 F. 307, 311 (7th Cir. 1919).

**46.** *Larson v. State,* 564 P.2d 365, 372 (Alaska 1977); *Stock v. State,* 526 P.2d 3, 12 (Alaska 1974); *Harris v. State,* 457 P.2d 638, 649 (Alaska 1969).

"It is impossible to frame definitions which embrace all unfair practices. There is no limit to human inventiveness in this field. Even if all known unfair practices were specifically defined and prohibited, it would be at once necessary to begin over again. If Congress were to adopt the method of definition, it would undertake an endless task."

H.R.Conf.Rep.No.1142, 63rd Cong., 2d Sess. (1914). To the same effect is the Senate Report which states:

"The committee gave careful consideration to the question as to whether it would attempt to define the many and variable unfair practices which prevail in commerce and to forbid their continuance or whether it would, by a general declaration condemning unfair practices, leave it to the commission to determine what practices were unfair. It concluded that the latter course would be the better, for the reason, as stated by one of the representatives of the Illinois Manufacturers' Association, that there were too many unfair practices to define, and after writing 20 of them into the law it would be quite possible to invent others."

Senate Report No. 597, 63rd Cong., 2d Sess., 13 (1914).

 In 1938, Congress adopted the Wheeler-Lea Amendment, 52 Stat. 111, which added the phrase "unfair or deceptive acts and practices" to the original language. This was a legislative abnegation of the holding of *F. T. C. v. Raladam Co.*, 283 U.S. 643, 51 S.Ct. 587, 75 L.Ed. 1324 (1930), restricting the coverage of the original enactment to "protection of the public from the evils likely to result from the destruction of competition or the restriction of it in a substantial degree . . . ." *Id.* at 647, 51 S.Ct. at 590, 75 L.Ed. at 1329. In *F. T. C. v. Brown Shoe Co.*, 384 U.S. 316, 321, 86 S.Ct. 1501, 1504, 16 L.Ed.2d 587, 591 (1966), a unanimous Supreme Court recognized that the Federal Trade Commission is endowed with "broad powers to declare trade practices unfair." The Federal Trade Commission has used both its legislative and adjudicatory powers to find deceptive collection practices unfair. It has adopted guidelines against debt collection deception.[47] It has found acts and practices of debt collection agencies identical to those charged by the State here to be unfair and deceptive acts and practices prohibited by Section 5 of the Federal Trade Commission Act.[48]

 The failure of the State to adopt regulations fleshing out the contours of the Alaska Act is, in light of Section 545 of the Act, saved by the Federal Trade Commission's interpretations of identical statutory language.[49] This infusion of F.T.C. law and regulations satisfies the fundamental due process insistence "that laws give the person of ordinary intelligence a reasonable opportunity to know what is prohibited, so that he may act accordingly." *Grayned v. City of Rockford*, 408 U.S. 104, 108, 92 S.Ct.

---

**47.** 16 C.F.R. Part 237. See note 28, *supra.*

**48.** See note 29, *supra* and accompanying text.

**49.** The Attorney General has statutory authority to adopt interpretative regulations. AS 45.-50.491. Properly promulgated interpretative rules, although not binding on the court generally have the same force as a statute. K. Davis, Administrative Law and Government, 126 (1960). The effect of adopting regulations would be "to give greater specificity and clarity to the broad standard of illegality—'unfair methods of competition . . . and unfair or deceptive acts or practices' . . .—which the [Attorney General] is empowered to prevent." *National Petroleum Refiners Ass'n v. F. T. C.*, 157 U.S.App.D.C. 83, 84, 482 F.2d 672, 673 (D.C.Cir.1973) *cert. denied*, 415 U.S. 951, 94 S.Ct. 1475, 39 L.Ed.2d 567 (1974). Substan-

tive rule-making is an invaluable adjunct to purely adjudicative proceedings because it shortens and simplifies that process and advances the orderly conduct of business. *Id.* 157 U.S.App.D.C. at 90, 482 F.2d at 679. "Increasingly, courts are recognizing that use of rule-making to make innovations in agency policy may actually be fairer to regulated parties than total reliance on case-by-case adjudication." *Id.* 157 U.S.App.D.C. at 92, 482 F.2d at 681.

We think that it would be the better practice for the Attorney General to exercise his discretionary rule-making power to fill in the interstices of the Alaska Act rather than relying exclusively on adjudication. *See S. E. C. v. Chenery Corp.*, 332 U.S. 194, 202, 67 S.Ct. 1575, 1580, 91 L.Ed. 1995, 2002 (1946).

2294, 2299, 33 L.Ed.2d 222, 227 (1972). The constitutional adequacy of the warning of proscribed conduct should be measured not only by common intelligence, but also by "common practice." *U. S. ex rel. Shott v. Tehan*, 365 F.2d 191, 198 (6th Cir. 1966), *cert. denied*, 385 U.S. 1012, 87 S.Ct. 716, 17 L.Ed.2d 548 (1967). *See also Jordan v. De George*, 341 U.S. 223, 231–32, 71 S.Ct. 703, 707–08, 95 L.Ed. 886, 892 (1951). Had O'Neill looked into the "commercial practice" as regulated by the Federal Trade Commission, it would have been put on notice that deceptive or unfair debt collections acts and practices were prohibited conduct. Any defects in the constitutional sufficiency of the warning provided by the Alaska Act is thus cured by authoritative administrative interpretations which clarify obscurities or resolve ambiguities. *Parker v. Levy*, 417 U.S. 733, 752–56, 94 S.Ct. 2547, 2559–61, 41 L.Ed.2d 439, 456–58 (1974).

■ Finally, arbitrary enforcement is not a proper due process consideration where a statute is challenged as vague not on its face, but as applied. "[O]ne to whom application of a [statute] is constitutional will not be heard to attack the [statute] on the ground that impliedly it might also be taken as applying to other persons or other situations in which its application might be unconstitutional." *U. S. v. Raines*, 362 U.S. 17, 21, 80 S.Ct. 519, 522, 4 L.Ed.2d 524, 529 (1960). As we said in *Stock v. State*, 526 P.2d 3, 12 (Alaska 1974): "While we may be able to conceive of instances in which the statute could be arbitrarily and capriciously enforced, we cannot on the basis of such mere hypothesis, in the absence of any history of actual arbitrary application, invalidate the statute." (*quoted in State v. Marathon Oil Co.*, 528 P.2d 293, 298 (Alaska 1974)). Absent a history or "strong likelihood of uneven application," *Stock v. State*, 526 P.2d 3, 8, the Alaska Act cannot be said to be unconstitutionally vague.

The trial court erred in concluding that the Alaska Act was unconstitutionally vague, and we must reverse its holding.

## IV

■ We are left now to consider whether it was error for the superior court to grant the motion to dismiss at the close of the State's evidence. The standard for granting a motion for involuntary dismissal under Alaska Rule of Civil Procedure 41(b) is whether the plaintiff has failed to present a prima facie case. *Correa v. Stephens*, 429 P.2d 254, 256 (Alaska 1967); *Pope v. Anderson*, 370 P.2d 185, 187 (Alaska 1962). At this stage of the proceedings, the evidence must be viewed in the light most favorable to the plaintiff. *Correa v. Stephens*, 429 P.2d 254, 265 (Alaska 1967). Where the court is sitting as a trier of fact, it may not resolve the motion to dismiss by weighing the evidence; if the plaintiff has put on a prima facie case based upon unimpeached evidence, the motion to dismiss must be denied. *King v. Alaska State Housing Authority*, 512 P.2d 887, 890 (Alaska 1973); *Trusty v. Jones*, 369 P.2d 420, 422 (Alaska 1962); *Rogge v. Weaver*, 368 P.2d 810, 813 (Alaska 1962).

■ Two elements must be proved to establish a prima facie case of unfair or deceptive acts or practices under the Alaska Act: (1) that the defendant is engaged in trade or commerce; and (2) that in the conduct of trade or commerce, an unfair act or practice has occurred.

■ As to the first element, the trial court properly found that O'Neill is engaged in trade or commerce as a business entity, regulated under the Department of Commerce. As to the second, we must determine whether the proof adduced at trial demonstrates that unfair acts or practices were perpetrated by O'Neill. An act or practice is deceptive or unfair if it has the capacity or tendency to deceive. *Federal Trade Commission v. Raladam Co.*, 316 U.S. 149, 152, 62 S.Ct. 966, 968, 86 L.Ed. 1336, 1340 (1942).[50] Actual injury as a result of

---

50. *See also, Resort Car Rentals Sys., Inc. v. F. T. C.*, 518 F.2d 962, 964 (9th Cir. 1975) *cert. denied sub nom., MacKenzie v. U. S.*, 423 U.S. 827, 96 S.Ct. 41, 46 L.Ed.2d 42 (1975); *Thiret v. F. T. C.*, 512 F.2d 176, 180 (10th Cir. 1975); *Spiegel, Inc. v. F. T. C.*, 494 F.2d 59 (7th Cir.

the deception is not required.[51] Intent to deceive need not be proved.[52] All that is required is a showing that the acts and practices were capable of being interpreted in a misleading way.[53] Testimony of consumers that they were misled is sufficient to sustain a prima facie case of unfair and deceptive practices.[54] An act or practice need not be "deceptive" to be "unfair." Unfairness will be determined by a variety of factors, including:

> (1) whether the practice, without necessarily having been previously considered unlawful, offends public policy as it has been established by statutes, the common law, or otherwise—whether, in other words, it is within at least the penumbra of some common-law, statutory, or other established concept of unfairness; (2) whether it is immoral, unethical, oppressive, or unscrupulous; (3) whether it

causes substantial injury to consumers (or competitors or other businessmen).
*F. T. C. v. Sperry & Hutchinson Co.*, 405 U.S. 233, 244–45 n.5, 92 S.Ct. 898, 905, n.5, 31 L.Ed.2d 170, 179 n.5 (1972).

Threats by debt collection agencies of imminent legal action when no such action is actually contemplated is a deceptive act or practice. *Trans World Accounts v. F. T. C.*, 594 F.2d 212, 215 (9th Cir. 1979); *Hearst Corp.*, 82 F.T.C. 951, 954 (1966). There was ample evidence at trial that such threats were made and never carried out.[55]

Threats to debtors that failure to pay would result in immediate arrest or jail or the filing of a criminal complaint are unfair acts, if the threats were actually believed by the debtors. The record is replete with testimony that O'Neill made such threats to alleged debtors and their spouses and that such threats were believed.[56]

1974) *cert. denied*, 419 U.S. 896, 95 S.Ct. 175, 42 L.Ed.2d 140 (1974).

**51.** *Floersheim v. F. T. C.*, 411 F.2d 874, 878 (9th Cir. 1969), *cert. denied*, 396 U.S. 1002, 90 S.Ct. 551, 24 L.Ed.2d 494 (1970). ("Deception itself is the evil the statute is designed to prevent.")

**52.** *Warner Lambert Co. v. F. T. C.*, 183 U.S. App.D.C. 230, 244, 562 F.2d 749, 763 (D.C.Cir. 1977); *Montgomery Ward & Co. v. F. T. C.*, 379 F.2d 666, 672 (7th Cir. 1967).

**53.** *Resort Car Rentals Sys., Inc. v. F. T. C.*, 518 F.2d 962, 964 (9th Cir. 1975).

**54.** *Beneficial Corp. v. F. T. C.*, 542 F.2d 611, 618 (3rd Cir. 1976) *cert. denied*, 430 U.S. 983, 97 S.Ct. 1679, 52 L.Ed.2d 377 (1977).

**55.** Five witnesses testified that they were informed by representatives of O'Neill that failure to pay within a specified number of hours would result in the filing of a lawsuit. Two other witnesses testified that they concluded from notices received from the defendant that they would be sued if the defendant was not paid.

One witness testified that on one occasion she was called by "Mrs. Lee of the legal department" and was told on another occasion that the papers were on Mr. O'Neill's desk and that on another occasion that Mrs. Lee had already "gone to the court house." Despite the fact that she ignored the calls she was not sued. Mrs. Walton, an O'Neill employee, admitted that the employees were not instructed to only tell debtors they would be sued if O'Neill actu-

ally intended to sue them. She also testified that it was very possible collectors told debtors that they would be sued on debts of less than $100.

**56.** Donna Buckalew testified that she was told in front of her children that she would be arrested the following day and that her children would be taken from her by the State. Mrs. Buckalew also testified that she had a ninth grade education and believed that she would be arrested and that the checks which O'Neill Investigations was trying to collect were about 10 years old. She also testified that she had been living at the same address for five years and had never been contacted regarding the checks prior to this incident.

Kerry Mae Hill testified she was told she had 48 hours to bring the money she owed to O'Neill or her husband would be picked up and put in jail. She also testified she was asked whether she had been in any trouble with the police before and whether she had a place for her two year old son to stay when she went to jail. Mrs. Hill, who was 17 at the time the calls were received, testified she believed she would be sent to jail if O'Neill's was not paid.

Jeff Hill testified he was told he could serve a six month sentence for each check his wife had written.

Sheryl Zerba testified she was told she would be put in jail if O'Neill was not paid and that she believed the threat.

Tommy Long testified he was called at work and told that if he did not pay O'Neill the state troopers would come out and pick him up.

■ Harassment of debtors by telephone calls to them, their relatives or their employers constitutes an unfair act or practice. *Hearst Corp.*, 82 F.T.C. 1792, 1797 (1973); *Neighborhood Periodical Club, Inc.*, 81 F.T.C. 93, 101 (1972). Six witnesses testified that they were contacted by telephone regarding debts of others.[57] Employees of O'Neill testified that employers of debtors were contacted for assistance in collecting debts, or for information about garnishing wages prior to judgment.

A misrepresentation by a debt collection agency that failure to pay an alleged debt will result in impairment of one's credit rating has been held to be an unfair and deceptive act or practice. *Hearst Corporation*, 82 F.T.C. 1792, 1797 (1973); *Neighborhood Periodical Club, Inc.*, 81 F.T.C. 93, 101 (1972); *Key Learning Systems, Inc.*, 81 F.T.C. 296, 306 (1972); *Book Club Guild, Inc.*, 65 F.T.C. 785, 790 (1964). There was testimony that O'Neill made such misrepresentations.[58]

■ The use by collection agencies of simulated legal documents [59] or collection forms labelled "Final Demand Before Legal Action" [60] when no legal action is in fact taken constitutes a deceptive act. *Trans America Collections, Inc.*, 83 F.T.C. 525, 532 (1973); *Neighborhood Periodical Club, Inc.*, 81 F.T.C. 93, 101 (1972); *Liquidation Corp. of America*, 69 F.T.C. 628, 636 (1966). There was testimony at trial that such notices were sent to debtors by O'Neill without regard to O'Neill's intentions either to file suit or to recommend that merchants file criminal complaints.

■ In short, there was substantial evidence presented by the State to demonstrate a prima facie case that O'Neill engaged in unfair or deceptive acts or practices. Under these circumstances, it was error to grant the motion to dismiss. The decision of the superior court must be vacated and the case remanded for completion of the trial. *King v. Alaska State Housing Authority*, 512 P.2d 887, 890 (Alaska 1973).[61]

---

Annie Patkotak testified she was called and told she would go to jail and that she believed she would.

O'Neill's employees testified that such threats were in fact made.

57. Wallace Vought testified that he received four calls regarding debts of two employees. Madeline Pocock testified that she received approximately two phone calls a week over a three month period of time regarding the debt of her brother. A pastor testified that he was called several times regarding the debt of a member of his congregation. Barney Seiler and Douglas Jones testified that they were called by O'Neill regarding the debt of an employee. Mary Noll testified that she was contacted by O'Neill and informed that her 16 year old daughter-in-law had probably committed forgery by signing a check in her husband's name.

58. Carole Lindblade testified she was told that if she did not pay a disputed doctor bill her children would not receive medical services in the State of Alaska. Ned Hahn testified he was told he would not be able to do business in Anchorage unless the defendant was paid. Betty Jean Bass testified that she was told J. C. Penney's would take away her credit card if she did not pay the defendant.

59. One form has "WARNING" printed along the top of the card in red ink, and states "this is your official notification" and "read the cita-

tions covering law on assignments and pay no one but this office." This creates the false impression that the debtor can no longer deal directly with the creditor and that the notice has an "official" source.

60. Another is entitled "Notice Before Legal Referral" and declares,

This account will be referred to our attorney with our authorization to take any action he deems appropriate.

This notice was used without regard to whether the account would actually be referred to an attorney.

O'Neill also sent out forms, when no legal action was pending, which read:

This is to notify _____ of pending action to take place on _____. All additional costs which may be incurred in said action will be added to balance now due.

and

This is to notify _____ of action pending to be filed with proper authorities on _____. As is required, you have been notified of this returned check prior to the action being filed by the merchant (Alaska Criminal Statutes Sec. 11.20.220)

61. Because of the untimely death of Judge Kalamarides, the trial judge should have the option of either familiarizing himself with the case by listening to the tape recording of the proceedings, or granting a new trial.

In view of this disposition, the issue of the award of attorney's fees to O'Neill is moot.

REVERSED and REMANDED.

BOOCHEVER and BURKE, JJ., not participating.

DIMOND, Senior Justice, with whom Chief Justice RABINOWITZ joins, concurring.

I concur in the result reached by Justice Connor in his opinion in this case. However, the authorities on which he relies[1] suggest that a statute should not be considered penal so long as the legislature labels the penalties for its violation "civil," and so long as the provision so labeled is not of the class of " 'traditionally criminal provisions.' " *See United States v. J. B. Williams*, 498 F.2d 414, 421 (2d Cir. 1974) (quoted in Justice Connor's opinion). To the extent that Justice Connor's opinion carries that implication, I disagree.

Complete deference to the legislature's labeling of a statute or sanction as civil is inconsistent with prior decisions by this court. In *Baker v. City of Fairbanks*, 471 P.2d 386, 390 (Alaska 1970), we noted that it is " 'the nature of the offense, and the amount of punishment prescribed, rather than its place in the statutes, [which] determine whether it is to be classed among serious or petty offenses' " (quoting *Schick v. United States*, 195 U.S. 65, 68, 24 S.Ct. 826, 827, 49 L.Ed. 99, 101 (1904)). By the same token, it is the nature of the act penalized and the amount of the penalty prescribed which should determine whether the sanction involved in this case is civil or penal. As this court indicated in *Gwynn v. Gwynn*, 530 P.2d 1311, 1312 n.6 (Alaska 1975), the possibility of a punitive sanction may give rise to the need for procedural safeguards such as the right to a jury trial, even though the sanction may be designated civil in nature. I agree with the commentator who said that complete deference to the legislative label

> is a gross abdication of the judicial role. . . . [I]t avoids the substantive question of whether [the legislature] has exceeded its constitutional authority. . . . When constitutional safeguards are involved, it is the function of the courts ultimately to decide whether and under what circumstances these protections apply.

Charney, *The Need for Constitutional Protections for Defendants in Civil Penalty Cases*, 59 Cornell L.Rev. 478, 494 (1974).

Furthermore, this court has held that it will not be bound by tradition in determining whether a statute is criminal or civil. "[C]ontemporary social values, rather than historical categorizations, should determine whether a prosecution is criminal . . ." *State v. Browder*, 486 P.2d 925, 936 (Alaska 1971) (citing *Baker*, 471 P.2d at 396).

Thus, I believe that neither the legislative label nor the fact that the unlawful act is not traditionally criminal is sufficient reason for the conclusion that the statute involved in this case is remedial rather than punitive. A more reasoned analysis is available.

In *Baker* we excluded from the category of criminal prosecutions "legal measures which can be considered regulatory rather than criminal in their thrust, so long as incarceration is not one of the possible mod-

---

That choice is allowed under Alaska R.Civ.P. 63(c) which provides:

*After Verdict, etc.* If by reason of death, sickness or other disability, a judge before whom an action has been tried is unable to perform the duties to be performed by the court under these rules after a verdict is returned or findings of fact and conclusions of law are filed, then any other judge of the court, assigned by the presiding judge of the judicial district where the action has been tried or by the chief justice of the supreme court, may perform those duties; but if such other judge is satisfied that he cannot perform those duties because he did not preside at the trial or for any other reason, he may in his discretion grant a new trial.

1. In particular I refer to *United States v. J. B. Williams*, 498 F.2d 414, 421 (2d Cir. 1974). *See also Frank Irey, Inc. v. Occupational Safety and Health Review Commission*, 519 F.2d 1200, 1204 (3d Cir. 1975); *Atlas Roofing Co. v. Occupational Safety and Health Review Commission*, 518 F.2d 990, 1011 (5th Cir. 1975).

es of punishment." [2] 471 P.2d at 402. The statutory prohibition of unfair or deceptive trade practices is regulatory rather than criminal in its thrust.

In *Alaska Public Defender Agency v. Superior Court*, 584 P.2d 1106 (Alaska 1978), we used a three-part test to determine whether a proceeding was a criminal prosecution. The inquiry for one part was whether a statutory violation " 'connote[s] criminal conduct in the traditional sense of the term.' " *Id.* at 1110 (quoting *Baker*, 471 P.2d at 402). This part of the test is not favorable to O'Neill's argument that the statute involved here is penal in nature because, like the petitioner in *Alaska Public Defender Agency*, O'Neill has not shown that unfair trade practices are traditional offenses "in the sense that social condemnation of such behavior has been long established as part of the common law proscribing criminal conduct." 584 P.2d at 1110.

The other two parts of the test as set forth in *Alaska Public Defender Agency* relate (1) to whether the unlawful act so offends contemporary social values as to be considered criminal and (2) to whether the monetary penalty is so heavy that it indicates a community judgment of criminality.[3] *Id.*

Contemporary social values may be severely offended by unfair or deceptive trade practices, particularly those alleged in this case. Furthermore, the argument that a penalty of $5,000 per violation indicates criminality deserves consideration. However, the reason that the court has used contemporary social values and heaviness of the authorized penalty as measures of criminality is that they are a gauge of the community's ethical and social judgment of persons who commit the unlawful act. In turn, the reason for determining the com-

munity's judgment of such persons is that the extent and nature of that judgment helps one predict the severity of collateral consequences which may be suffered by the defendant. *Baker*, 471 P.2d at 395. In discussing potential collateral consequences of a conviction under the ordinance in *Baker*, we noted that "one convicted under this ordinance might suffer severe disabilities in obtaining future employment or in having heaped upon him a certain amount of social opprobrium." *Id.*

The collateral consequences of a finding that a debt collection agency or other business has committed "unfair or deceptive acts or practices in the conduct of trade or commerce" [4] are not of this nature. In O'Neill's case, the unlawful acts alleged harmed debtors but not O'Neill's customers, for whom debts were collected. Therefore, a finding of unfair practices by O'Neill with respect to debtors is unlikely to have severe collateral consequences for O'Neill's business.

For these reasons, I agree that AS 45.50.-471–561 is not a penal statute.

MATTHEWS, Justice, dissenting.

For the reasons expressed by Justice Dimond in his concurring opinion I agree that the penalties to be exacted under AS 45.50.-551(b) may be regarded as civil rather than criminal. However, I believe that O'Neill has the right to a civil jury trial because of the claim for monetary penalties.

The question whether there is a right to a civil trial by jury in this case is raised, but not briefed very well, in O'Neill's opening brief. The state's brief on this point is adequate, however, and O'Neill's reply brief addresses it with reference to some authorities. On balance I believe that the briefing

---

**2.** At the time of O'Neill's trial, incarceration was an authorized form of punishment under AS 45.50.551(c). However, AS 45.50.471(d) provided that the criminal provisions were applicable only if the defendant "acted knowingly and with intent," which the state did not allege in this case. And as noted by Justice Connor, repeal of these provisions became effective January 1, 1980. Act of July 17, 1978, ch. 166, § 21, SLA 1978.

**3.** "A heavy enough fine might also indicate criminality because it can be taken as a gauge of the ethical and social judgments of the community." *Baker*, 471 P.2d at 402 n. 29, *quoted in Alaska Public Defender Agency*, 584 P.2d at 1110.

**4.** AS 45.50.471(a).

is sufficient so that the point should not be considered waived.

Article I, section 16 of the constitution of Alaska provides, in part:

> In civil cases where the amount in controversy exceeds two hundred fifty dollars, the right of trial by a jury of twelve is preserved to the same extent as it existed at common law.

In *Loomis Electronic Protection, Inc. v. Schaefer*, 549 P.2d 1341 (Alaska 1976), we interpreted this provision as affording a right to trial by civil jury to one accused of a discriminatory hiring practice. The statute involved in *Loomis* required the court to enjoin any illegal discriminatory act and allowed such "other relief, including the payment of money, that is appropriate." AS 22.10.020(c). The court in *Loomis* construed the statutory language to encompass both compensatory and punitive damages and noted that these remedies were of the sort traditionally tried before a jury at common law. The court stated:

> [W]here part of the relief sought is compensatory and punitive damages, we believe that Art. I, Sec. 16, of the Constitution of Alaska guarantees the parties the right to a jury trial. [Footnote omitted].

*Id.* at 1344. The court also noted with approval the observation "that the right to a jury trial 'cannot be abridged by characterizing the legal claim as "incidental" to the equitable relief sought.'" *Id.* at 1344 n. 15 *quoting Curtis v. Loether*, 415 U.S. 189 at 196, n. 11, 94 S.Ct. 1005 at 1009 n. 11, 39 L.Ed.2d 260 at 267 n. 11 (1974).

I do not think that the result in *Loomis* would have been any different if only punitive damages had been sought. Likewise, I can see no meaningful distinction between punitive damages and a civil penalty. Therefore I think *Loomis* controls, and O'Neill is entitled to a civil jury trial.

In reaching this conclusion I do not challenge the majority's statement that the Alaska Unfair Trade Practices and Consumer Protection Act "stands as a sentinel against unethical and unscrupulous conduct," (opinion p. 523) or the salutary purposes of the Act. However, any statute is capable of being abused, especially where its language is broad and the plaintiff has the resources of the government. The right to a trial by a jury is a safeguard against the possibility of abuse. I do not think it should be abandoned here.

Accordingly, I would reverse and remand and put the state to an election. If the state persists in its request for monetary relief, a new trial before a civil jury is necessary; if it chooses to pursue only injunctive relief, the trial which was terminated at the close of the state's case may be continued before a judge sitting without a jury, unless the judge decides to order a new trial under Alaska Rule of Civil Procedure 63(c).